UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DONALD G. DRAPKIN,

     *Plaintiff and Counterclaim Defendant,*

     -against-

MAFCO CONSOLIDATED GROUP, INC.,

     *Defendant and Counterclaim Plaintiff.*

09 Civ. 1285 (PGG)

ECF Case

**PLAINTIFF AND COUNTERCLAIM DEFENDANT DONALD G. DRAPKIN'S
MEMORANDUM OF LAW IN SUPPORT OF HIS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Elkan Abramowitz
Thomas M. Keane
Sidhardha Kamaraju
Gretchan Ohlig
Morvillo, Abramowitz, Grand, Iason,
Anello & Bohrer, P.C.
565 Fifth Avenue, New York, NY 10017
(212) 856-9600

David Dunn
Christine Wagner
Hogan Lovells US LLP
875 Third Avenue, New York, NY 10022
(212) 918-3000

*Attorneys for Donald G. Drapkin*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS................................................................................... 3

ARGUMENT.................................................................................................... 9

I.   THE COMPANY HAS NO CLAIM FOR BREACH OF SECTION 3(b) ......................... 10

II.  THE COMPANY'S CLAIMS CONCERNING DOCUMENTS DO NOT
     SHOW BREACHES OF THE SEPARATION AGREEMENT THAT
     WOULD EXCUSE IT FROM PERFORMING ............................................... 14

     A.   Drapkin Did Not Breach Section 6(a) .................................................. 14

     B.   Drapkin Did Not Breach Section 6(h) .................................................. 16

          1.   Section 6(h) Applies as of the Time of Drapkin's Departure..................... 16

          2.   The Company Cannot Show that the Documents Were Not
               "Otherwise Available" ............................................................... 17

          3.   The Company Cannot Show that the Documents Were in
               Link's or Drapkin's Personal Possession at the Time of their
               Departure .............................................................................. 20

     C.   Unwitting Retention of the Other Documents is Not a Material Breach................ 22

III. THERE IS NO ADMISSIBLE EVIDENCE OF ANY DISPARAGEMENT .................... 24

     A.   There Is No Evidence of a Breach of Section 5 ..................................... 25

          1.   The Company Failed to Give Notice of Breach, as Required .................... 26

          2.   No Alleged Disparagement Entered or Was Likely to Enter the
               Public Domain ........................................................................ 26

CONCLUSION................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*,
   136 F.3d 82 (2d Cir. 1998) ............................................................................................. 11

*Alfano v. Nat'l Geo. Channel*,
   No. 06 Civ. 3511, 2007 WL 2982757 (E.D.N.Y. Oct. 5, 2007) ......................................... 24

*Bouchard v. New York Archdiocese*,
   No. 04 Civ. 997, 2010 WL 1173001 (S.D.N.Y. Mar. 24, 2010) ........................................ 17

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ......................................................................................................... 10

*Citibank, N.A. v. 666 Fifth Ave. Ltd. P'ship*,
   2 A.D.3d 331, 769 N.Y.S.2d 268 (1st Dep't 2003) .......................................................... 13

*Del Global Tech. Corp. v. Park*,
   No. 03 Civ. 8867, 2008 WL 5329963 (S.D.N.Y. Dec. 15, 2008) (Gardephe, *J.*) ............. 10, 11

*DeSouza v. P.L.U.S.F.U.N.D.S Group., Inc.*,
   No. 05 Civ. 5990, 2007 WL 4287745 (S.D.N.Y. Dec. 7, 2007) ........................................ 17

*Dun & Bradstreet Corp. v. HarperCollins Publishers*,
   872 F. Supp. 103 (S.D.N.Y. 1995) (Kaplan, *J.*) .............................................................. 23

*Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co.*,
   375 F.3d 168 (2d Cir. 2004) ........................................................................................ 10, 11

*Evans v. Famous Music Corp.*,
   1 N.Y.3d 452, 775 N.Y.S. 2d 757, 807 N.E.2d 869 (2004) ............................................... 13

*Federal Ins.. Co. v. Americas Ins. Co.*,
   258 A.D.2d 39, 691 N.Y.S.2d 508 (1st Dep't 1999) ......................................................... 13

*Fleming v. Verizon New York Inc.*,
   No. 03 Civ. 5639, 2006 WL 2709766 (S.D.N.Y. Sept. 22, 2006) ...................................... 24

*Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*,
   111 F.3d 284 (2d Cir. 1997) ............................................................................................. 22

*Global Crossing Bandwidth, Inc. v. PNG Telecomms., Inc.*,
   No. 06 Civ. 64157, 2008 WL 2079914 (W.D.N.Y. May 15, 2008) ..................................... 15

*Goenaga v. March of Dimes Birth Defects Found.*,
   51 F.3d 14 (2d Cir. 1995) ................................................................10

*Grassi & Co. v. Janover Rubincott, LLC,*
   No. 015743/2008, 2009 WL 3813764 (N.Y. Sup. Ct. Nassau County Oct. 26, 2009) ..........23

*Great Canal Realty Corp. v. Seneca Ins. Co.,*
   5 N.Y.3d 742, 800 N.Y.S.2d 521, 833 N.E.2d 1196 (2005) ...................................26

*Greenfield v. Philles Records, Inc.*,
   98 N.Y.2d 562, 750 N.Y.S.2d 565 (2002) ..........................................................10

*In re Spectrum Info. Tech., Inc.*,
   190 B.R. 741 (Bankr. E.D.N.Y. 1996) ...............................................................23

*Mastrovincenzo v. City of New York*,
   435 F.3d 78 (2d Cir. 2006) ..............................................................................27

*Pal v. New York University*,
   No. 06 Civ. 5892, 2008 WL 2627614 (S.D.N.Y. June 30, 2008) .........................24

*Rexnord Holdings, Inc. v. Bidermann*,
   21 F.3d 522 (2d Cir. 1994) ..............................................................................10

*Rizkallah v. Forward Air, Inc.,*
   No. 02 Civ. 2448, 2009 WL 3029309 (S.D.N.Y. Sept. 22, 2009) (Gardephe, *J.*) ....................9

*Schiller v. City of New York*,
   No. 04 Civ. 7922, 2008 WL 4525341 (S.D.N.Y. Oct. 9, 2008) ...........................24

*Smith v. Daily Mail Publ'g Co.*,
   443 U.S. 97 (1979) .........................................................................................27

*Sterling Investor Servs., Inc. v. 1155 Nobo Assocs., LLC*,
   30 A.D.3d 579, 818 N.Y.S.2d 513 (2d Dep't 2006) ...........................................15

*U.S. Bank Nat'l Ass'n v. Southwest Airline Co.*,
   No. 07 Civ. 11131, 2009 WL 2163594 (S.D.N.Y. July 20, 2009) .........................16

*Unigard Sec. Ins. Co. v. North River Ins. Co.,*
   79 N.Y.2d 576, 584 N.Y.S.2d 290, 594 N.E.2d 571 (1992) ...................................23

*United States ex rel. Doe v. John Doe Corp.*,
   960 F.2d 318 (2d Cir. 1992) ............................................................................27

*Weaver v. Chrysler Corp.,*
   172 F.R.D. 96 (S.D.N.Y. 1997) .......................................................................27

*Wechsler v. Hunt Health Sys., Ltd.*,
    186 F. Supp. 2d 402 (S.D.N.Y. 2002) ................................................................22

**OTHER AUTHORITIES**

*Merriam-Webster Dictionary* 150 (3d ed. 1986) ......................................................17

Rule 26, F. R. Civ. P. ...........................................................................................2, 24

Plaintiff and Counterclaim Defendant Donald G. Drapkin submits this memorandum in support of his motion for summary judgment on his counterclaim for breach of contract and to dismiss the counter claim, for breach of contract, brought by Defendant Mafco Consolidated Group Inc. (õMafcoö).[1]

## PRELIMINARY STATEMENT

In 2007, Donald Drapkin separated from M&F, after 20 years as its Vice Chairman. Pursuant to agreements made then, M&F and its affiliate Mafco agreed to pay Drapkin a total of $27.5 million, in installments over time through July 1, 2012. Drapkin received the first $9.5 million due to him but ó without notice, explanation, or justification ó the Company refused to make the $2.5 million payment due on January 1, 2009, and has since refused to pay each of the $2.25 million payments that were due on July 1, 2009 and January 1, 2010. The next installment of $2.5 million is due tomorrow, July 1, 2010.

To obtain the payments he is due, Drapkin initiated this litigation. The Company made no attempt to justify its sudden failure to honor its contractual obligations until after Drapkin sued. Then, for the first time, the Company asserted that Drapkin breached the Separation Agreement. But, the breaches assertedô even if supported by evidence, which they are notô are so trivial that they could not justify the refusal to pay Drapkin the more than $18 million still owed to him under his agreements. M&F is simply evading its contractual obligations.

In its defense, the Company pleaded two separate contrived claims of õbreachö by Drapkin and has suggested that it intends to rely in addition on a third such claim not even specified in its pleadings. First, the Company asserts that Drapkinøs receipt of reimbursement for medical expenses breached Section 3(b) of his Separation Agreement. That claim is based on a

---

[1] M&F and Mafco Consolidated Group Inc. are referred to herein collectively as õthe Companyö.

wholesale misreading of the plain, unambiguous language of the Separation Agreement, which expressly required the Company to reimburse medical expenses of Drapkin and his family, unless such expenses were actually reimbursed from another source. The Company concedes that the expenses claimed were not reimbursed from other sources and therefore this assertion is frivolous.

Second, the Company asserts that Drapkin retained – on the laptop of his assistant (which the Separation Agreement expressly permitted her to keep) – documents relating to M&F's business, which Drapkin was obligated to return. To the extent materials were retained, there was no contractual obligation to return them. The contract expressly limited Drapkin's obligation to return materials from the laptop to those materials that were "not otherwise available" to the Company. Simply put, there is no evidence that the material at issue was not otherwise available to the Company and, therefore, this argument fails as well. No use – improper or otherwise – of any such material is claimed.

Third, although it failed to raise this issue in its pleadings, the Company appears to contend that Drapkin breached the Separation Agreement by disparaging it and its Chairman, Ronald O. Perelman. This unpleaded contention rests on statements of Drapkin that allegedly occurred in the summer of 2007 according to a company official, a witness who the Company did not identify in its Rule 26 disclosures or interrogatory responses. The incident was never the subject of any claim or comment by the Company until late 2009. In any event, this putative claim arises from comments the Company alleges Drapkin made in circumstances where they did not – nor were likely to – enter the "public domain," an express requirement under the Separation Agreement for any claimed disparagement to constitute a breach. Therefore, summary judgment is appropriate on this point as well.

What is extraordinary about all three claimed "defenses" is the total absence of any material injury to the Company. With respect to the purported disparagement, the only concrete assertion that M&F has advanced on this subject involves private comments allegedly made by Drapkin (an allegation Drapkin denies) *to an M&F executive who remains employed by M&F to this day and who discussed them with no one except his wife*. With respect to the documents on his assistant's laptop, the Company makes no claim that the documents are sensitive, that Drapkin used them for any purpose, or that Drapkin even knew that they existed prior to this litigation. And, with respect to the health insurance, the Company's only possible damage is its incurrence of an incremental premium cost for continuing to cover Drapkin and his dependants under its health insurance plan. On the basis of these trivial – and unsupported – claims of "breach," the Company purports to justify withholding more than $18 million, and indeed is seeking rescission of the separation agreements under which it and Drapkin performed for almost two years. The Company's position is an abject makeweight and is wholly unsupported by the law. Summary judgment should be granted in favor of Drapkin.

## STATEMENT OF FACTS

<u>Drapkin's Tenure at M&F</u>

In the 1980s, Ronald O. Perelman recruited his friend and legal advisor, Donald Drapkin, to work with him at M&F. R. 56.1 St. ¶¶ 9-10 & 15.[2] As a result, Drapkin served as vice chairman of M&F for 20 years, from 1987 through 2007. *Id.*, ¶¶ 10 & 20.

Drapkin acted as M&F's in-house investment banker, identifying investment opportunities, monitoring those investments, and advising in connection with their later sale. *Id.*,

---

[2] The facts necessary for determination of this motion are set forth in Donald G. Drapkin's Rule 56.1 Statement in Support of his Motion for Summary Judgment ("R. 56.1 St.") and the exhibits annexed thereto.

¶ 12. Throughout that period, Drapkin also made and managed extensive personal investments. *Id.*, ¶ 13. During Drapkin's tenure at M&F, his personal assistant Nancy Link focused mainly on his personal activities. *Id.*, ¶ 94. She maintained records concerning Drapkin's personal affairs, properties and investments matters, either in electronic form on her laptop computer or in hardcopy files mostly kept at the M&F offices. *Id.*, ¶¶ 96-97.

Other than managing Drapkin's calendar, answering his office telephone, and managing his personal affairs, Link had virtually no role with respect to Drapkin's business responsibilities at M&F. R. 56.1 St., ¶ 98. Because Link's work related to Drapkin's personal affairs and routinely involved sensitive personal information concerning subjects such as Drapkin's personal finances and the Drapkin family's healthcare, Link did not store electronic files on M&F's shared computer servers. *Id.*, ¶ 100. Instead, she stored such files on her laptop computer. *Id.*, ¶ 97. M&F was aware that Link did not store files on the company's servers. *Id.*, ¶ 101.[3]

<u>The Separation Agreement and Stock Purchase Agreement</u>

In the period before 2007, Drapkin's personal relationship with Mr. Perelman became strained, and his responsibilities at M&F diminished. R. 56.1 St., ¶¶ 17-18. In 2007, Drapkin decided to leave M&F. *Id.*, ¶ 20. Link left with Drapkin and has continued to act as his personal assistant. *Id.*, ¶ 32. Drapkin negotiated a separation agreement, dated April 25, 2007 (the "Separation Agreement"), and a stock purchase agreement bearing the same date (the "SPA"). *Id.*, ¶¶ 21 & 24. Pursuant to the SPA, Mafco agreed to purchase from Drapkin stock in a publicly traded M&F affiliate that Drapkin had acquired in market transactions. *Id.*, ¶ 25. The

---

[3] Unbeknownst to Drapkin, IT personnel working at M&F gave Link an external hard drive to use as a backup device for her laptop files. Although the IT staff suggested that Link use the backup device weekly, she rarely used it. When the backup device stopped working after she had left M&F, Link discarded it. She did not tell Drapkin about her decision to discard the device. R. 56.1 St., ¶¶ 102-07.

Separation Agreement terminated Drapkin's last employment agreement, which had been repeatedly renegotiated during his tenure, most recently in April 2006. *Id.*, ¶ 19 & Ex. 24.

M&F agreed to pay Drapkin $15.5 million under the Separation Agreement, and Mafco agreed to pay Drapkin $12 million to purchase 200,000 shares of M&F Worldwide stock from him under the SPA. R. 56.1 St., ¶¶ 23 & 25. M&F was to make six payments of $2.25 million, every six months, beginning on July 1, 2009, followed by one last payment of $2 million on July 1, 2012. *Id.*, ¶ 23. Mafco paid Drapkin $5,000,000 upon delivery of the M&F Worldwide shares, and agreed to pay the remaining $7,000,000, with interest, over time. *Id.*, ¶ 26. Two payments of $2.25 million were to be made on January 1, 2008 and July 1, 2008, and a final payment of $2.5 million was to be made on January 1, 2009. *Id.*

The Separation Agreement contained various other provisions, including provisions relating to medical expense reimbursement, continued access to e-mail, and the disposition of electronic equipment and confidential documents. *Id.*, Ex. 24. With respect to medical expense reimbursement, M&F agreed that:

> Until you reach the age of 65, the Company will reimburse you for any medical expenses (defined as those expenses covered by the executive medical reimbursement program then in effect for the Company, from time to time) incurred by you and your immediate family which are not otherwise reimbursed through medical plans, if any, covering you or your immediate family.[4]

*Id.*, ¶ 48 & Ex. 24, § 3(b). With respect to the disposition of confidential documents, Section 6(a) of the Separation Agreement provided that Drapkin agreed:

> [T]o deliver promptly to the Company at any time the Company may so request all memoranda, notes, records, reports, manuals, drawings, blueprints and other documents (and all copies thereof), including data stored in computer memories or on other media used for electronic storage and retrieval, relating to the

---

[4] Drapkin's prior employment agreements with M&F had provided for his medical coverage to continue until he reached age 80. As part of his separation, Drapkin agreed that M&F would be obligated to provide such coverage only until he reached age 65.

> Company's business or the business of its affiliates and all property associated
> therewith, which you may possess or have under your control.

R. 56.1 St., ¶ 75 & Ex. 24, § 6(a). And, with respect to electronic equipment, Section 6(h) of the

Separation Agreement provided that Drapkin would return his office computer but,

"[n]otwithstanding anything in Section 6.a to the contrary," he could retain certain other

equipment, including Link's laptop computer:

> provided that you promptly provide to the Company copies of all electronic files
> in your (or your personal assistant's) personal possession relating to the Company
> or its affiliates and not otherwise available to the Company, after which you
> delete (and do not attempt to recover) all copies of such files in your possession.[5]

*Id.*, ¶ 81 & Ex. 24, § 6(h).

<u>Drapkin's Departure from M&F</u>

Drapkin ended his employment at M&F effective May 1, 2007. R. 56.1 St., ¶ 22. On

that date, he became Vice Chairman of Lazard Ltd. *Id.*, ¶ 31. As a result, Link packed up

Drapkin's office on April 30, 2007, with the assistance of M&F personnel. *Id.*, ¶ 108. As part of

that process, Link boxed up some of her hardcopy files to have sent to their new office at Lazard.

*Id.* She also left a substantial quantity of hardcopy files at M&F. *Id.*, ¶ 109.

Drapkin told Link to delete from her laptop any documents that they would no longer

need. *Id.*, ¶ 110. Link understood that to mean that she should discard materials unrelated to

Drapkin's personal affairs and investments. R. 56.1 St., ¶¶ 111-12. On that basis, Link reviewed

the files on her laptop and deleted the files that she felt were no longer needed, including files

that appeared to relate only to the business of M&F, as distinguished from those documents that

related to Drapkin's personal affairs. *Id.*, ¶ 112.

---

[5] Section 6(h) also provided that M&F would arrange for forwarding of e-mails addressed to
Drapkin's and Link's M&F e-mail addresses, for a period of two years. In fact, until at least
May 12, 2008, Drapkin's and Link's M&F e-mail accounts remained active.

Drapkin left behind his desktop computer, as the Separation Agreement required. *Id.*, ¶ 113. M&F cannot state what it did with that desktop computer. *Id.*, ¶¶ 114-17. M&F personnel speculate that it was reformatted, meaning that its contents were irretrievably erased. *Id.*, ¶ 115. M&F made no effort to inventory the contents of Drapkin's desktop computer, nor did the company preserve a record of the e-mails and e-mail attachments that existed in Drapkin's and Link's accounts on the company's e-mail server and backup tapes at the time of their departure. *Id.*, ¶¶ 114, 136-37.

At the time of Drapkin's departure from M&F, Lazard issued a press release announcing his new position there. R. 56.1 St., ¶ 33. That release quoted Perelman as saying that "Don was a dynamic force in the development and leadership of our firm. He is not only a close friend, but a wise counsel to me and our team, and he is joining an exceptional leadership team at Lazard. He has done a terrific job for us and we will miss him." *Id.*

<u>Drapkin's Continued Health Insurance Coverage</u>

Within days of Drapkin's departure, an issue arose with respect to his medical reimbursement under the Separation Agreement. R. 56.1 St., ¶ 49. Relying upon the continued coverage provided as part of the Separation Agreement, Drapkin elected not to incur the cost of enrolling in Lazard's health insurance plan. *Id.*, ¶¶ 51-54. Apparently unaware of the applicable provision of the Separation Agreement, M&F employees wrongly terminated the Drapkin family from M&F's basic health insurance plan, effective May 1, 2007. *Id.*, ¶ 49.[6]

---

[6] During the relevant time period, M&F offered its executives two levels of coverage for health care costs. The first layer of coverage was a health insurance plan provided (from April 1, 2005 through December 31, 2008) by CIGNA. In addition, M&F provided a second layer of coverage (the "GEM plan") for senior executives that reimbursed them for certain health care expenses. M&F does not claim that Drapkin was not entitled to participate in the GEM plan. R. 56.1 St., ¶¶ 40-44.

Approximately two weeks after he left M&F, Drapkin called Michael Borofsky, an in house lawyer at M&F, to complain that Drapkin's wife had been told at a pharmacy that a prescription she was attempting to fill was not covered by insurance. *Id.*, ¶ 50. Drapkin informed Borofsky that he was not participating in Lazard's health insurance plan and that he was not obligated to purchase such coverage from Lazard under the Separation Agreement. *Id.*, ¶¶ 51-52. Borofsky advised Drapkin that he would consult with Barry Schwartz, a senior legal officer at M&F, as to the proper course. *Id.*, ¶ 55. Shortly thereafter, on May 9, 2007, after consulting with M&F's general counsel, Barry Schwartz, Borofsky wrote Drapkin, stating that: "you and the family are fully covered." *Id.*, ¶ 56.

Drapkin understood that the issue had been resolved. In 2008, however, M&F reviewed its health care expenditures and apparently concluded that the Drapkin family's expenses were "unexpectedly high"; at the time, Drapkin's wife was suffering from a serious health condition. R. 56.1 St., ¶¶ 64-65. Unaware of or ignoring Borofsky's 2007 e-mail, another M&F in-house lawyer, Steven Fasman, demanded in November 2008 that Drapkin provide M&F with copies of Lazard's health insurance plan documentation. *Id.*, ¶ 58. Drapkin forwarded to Fasman the e-mail he had received from Borofsky on May 9, 2007, confirming that the Drapkin family was "fully covered." *Id.*, ¶ 60. He also sent Fasman the Lazard health care plan documentation but noted that, under the Separation Agreement, he had no obligation to enroll in the Lazard plan. *Id.*, ¶ 61. Fasman then contacted Drapkin again and without explanation accused him of "improperly" seeking benefits under the M&F basic plan. *Id.*, ¶ 66. Drapkin disputed Fasman's contention. *Id.*, ¶ 67. Nonetheless, on December 9, 2008, to resolve the issue, Drapkin agreed that, as of January 1, 2009, he would enroll in Lazard's health insurance plan. R. 56.1 St., ¶ 68. Fasman gave no indication that the company reserved any right to claim that Drapkin's use of

M&F's basic health insurance plan in 2007 and 2008 was a breach of the Separation Agreement. *Id.*, ¶ 69.

<u>Mafco's Breach of the SPA</u>

Drapkin did not know that his problems with M&F were just beginning. Without explanation, Mafco then failed to make the $2.5 million payment to Drapkin due January 1, 2009.[7] R. 56.1 St., ¶ 37.

During the pendency of these actions thus far, two payments to Drapkin of $2.25 million each became due under the Separation Agreement, but M&F failed to make those payments and has asserted that it is excused from all future payments due to Drapkin under the Separation Agreement. *Id.*, ¶¶ 38-39. In other words, the Company has already withheld $7 million due to Drapkin and seeks to be excused from paying another $11 million due in the future, based upon: (i) Drapkin's receipt of health insurance from May 2007 through December 2008, with the full knowledge and acquiescence of M&F's senior officers; (ii) Drapkin's alleged retention of documents which the Company does not claim he used or disseminated (and which were otherwise available to the Company); and (iii) supposedly disparaging statements allegedly made at a private dinner by Drapkin to a close personal friend who was and still is an M&F officer. For the reasons set forth below, none of these assertions conceivably supports the Company's refusal to pay. To the contrary, summary judgment should be granted in favor of Drapkin.

**<u>ARGUMENT</u>**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." *Rizkallah v. Forward Air, Inc.,* No. 02 Civ. 2448, 2009 WL 3029309, at *5 (S.D.N.Y. Sept. 22,

---

[7] The prior two payments to Drapkin under the SPA, each in the amount of $2.25 million, were made as scheduled on or about January 1, 2008 and July 1, 2008. R. 56.1 St., ¶ 35.

2009) (Gardephe, *J.*) (quoting Fed. R. Civ. P. 56(c)).  In opposing summary judgment, a party cannot rely on unsupported assertions, conjecture or surmise, conclusory statements or contentions that the affidavits supporting the motion are not credible in attempting to establish a genuine issue as to any material fact.  *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  Moreover, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994) (emphasis in original).  A movant may satisfy its burden by demonstrating an absence of evidence to support the non-moving party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

The Company has failed to pay Drapkin over $7 million due to him under the SPA and the Separation Agreement.  The issue before the Court is whether the excuses proffered by the Company justify that failure.  They do not, and Drapkin is therefore entitled to summary judgment.

## I.  THE COMPANY HAS NO CLAIM FOR BREACH OF SECTION 3(b)

Paragraph 3(b) of the Separation Agreement requires the Company to reimburse Drapkin for medical expenses he or his immediate family incur that are "not otherwise reimbursed through medical plans, if any."  The unambiguous language of this provision precludes the Company from succeeding on any claim of breach – and the Company has conceded as much.

Under New York Law, "the fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent," and if an agreement is "complete, clear and unambiguous on its face, [it] must be enforced according to the plain meaning of its terms."  *Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004); *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565 (2002).  Whether a writing is ambiguous is a question of law.  *Eternity Global*, 375 F.3d at 178; *Del*

*Global Tech. Corp. v. Park,* No. 03 Civ. 8867, 2008 WL 5329963, at *3 (S.D.N.Y. Dec. 15, 2008) (Gardephe, *J.*). "Ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Eternity Global*, 375 F.3d at 178. When a writing is not ambiguous, the court "should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998).

The Company posits that Drapkin violated the medical reimbursement provision by (i) seeking reimbursement for medical expenses that would have been covered had he elected to purchase insurance that was available to him at substantial expense through his subsequent employer, and (ii) seeking reimbursement for a single expense incurred by his adult daughter. Each of these claims fails as a matter of law under the plain meaning of the Separation Agreement.

The Separation Agreement unambiguously provides that Drapkin is entitled to reimbursement for medical expenses so long as he has not sought or obtained reimbursement under another plan. Nothing in the plain language requires Drapkin to seek reimbursement through any other health insurance plan potentially available to him before seeking reimbursement from the Company. There is no claim, nor any basis for a claim, that Drapkin (or any member of his family) sought reimbursement under any other health plan for any claim submitted to M&F under section 3(b) of the Separation Agreement.

What the Company appears to assert is that Drapkin acted improperly by failing first to

obtain coverage under, and, second, to submit claims for reimbursement through, insurance he

could have purchased through Lazard.  But the plain language of section 3(b) of the Separation

Agreement imposes no duty on Drapkin to acquire alternative medical coverage.  Rather, this

section provides blanket reimbursement – except for expenses *actually* reimbursed by some other

plan or coverage.

Even if one somehow could torture this language to find ambiguity, the available parol

evidence makes clear that the Company's claim is based on a construction that is a complete and

recent fabrication.  M&F knew before Drapkin left its employ that he was to become a Vice

Chairman of Lazard and that Lazard made health insurance available for purchase by its

executives.  R. 56.1 St., ¶¶ 30, 31, & 59.  Within two weeks of Drapkin's departure, M&F

mistakenly removed Drapkin from its health insurance plans but, when he protested, promptly

reinstated his coverage, without inquiring about alternative coverage through Lazard.  Drapkin

never purchased coverage through Lazard.  Rather, he submitted dozens of medical expense

reimbursement claims, involving tens of thousands of dollars, through M&F, and those claims

were routinely paid for more than 18 months following his departure.

Then, suddenly, in November 2008, when Drapkin's wife was seriously ill and the

Company was looking to reduce its health care costs, M&F for the first time asked Drapkin

about Lazard's health insurance coverage.  Also for the first time, M&F then asserted that the

Separation Agreement imposed some obligation on Drapkin to obtain available medical coverage

under Lazard's plan.  Drapkin disputed that assertion.  *Id*., ¶ 67.  In compromise, Drapkin agreed

that he would continue to be covered under M&F's plan until December 31, 2008, and that from

January 1, 2009, he would elect coverage under Lazard's plans.  At no time while discussing this

compromise did M&F assert that it claimed or reserved the claim that Drapkin had materially

breached the Separation Agreement by submitting medical claims for reimbursement for expenses incurred before December 31, 2008. As noted, all such claims were paid – before and after Drapkin agreed to prospectively elect and purchase coverage under the Lazard plans – without complaint, protest, or reservation.

Thus, even if the Separation Agreement could somehow be read as requiring Drapkin to obtain medical coverage through Lazard, M&F would be estopped, based upon its course of dealing, from alleging that Drapkin's actions, which it induced and encouraged, constituted a breach of the Separation Agreement. *See Federal Ins.. Co. v. Americas Ins. Co.*, 258 A.D.2d 39, 44, 691 N.Y.S.2d 508, 512 (1st Dep't 1999) (parties' course of conduct determined intended meaning of contract language because there is "no more compelling evidence of intent" than the parties' actions); *see also Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 459, 775 N.Y.S. 2d 757, 761-63, 807 N.E.2d 869, 873 (2004) (resolving ambiguity in contractual language according to parties' course of performance); *Citibank, N.A. v. 666 Fifth Ave. Ltd. P'ship*, 2 A.D.3d 331, 332, 769 N.Y.S.2d 268, 269-70 (1st Dep't 2003).[8]

For the foregoing reasons, Drapkin acted in full compliance with Paragraph 3(b) of the Separation Agreement, and M&F's claims for breach of this provision of the Separation Agreement must be dismissed.

---

[8] Nor can M&F succeed on its theory that Drapkin breached the Separation Agreement when his eldest daughter, or someone on her behalf, allegedly sought reimbursement under the Company's medical plan despite her age or separate medical coverage. It is undisputed that Drapkin had no knowledge of the submission of this claim and that no M&F provider was held responsible for paying this claim, or in fact any claims post May 1, 2007 attributable to Drapkin's eldest daughter. R. 56.1 St., ¶¶ 73-74.

## II. THE COMPANY'S CLAIMS CONCERNING DOCUM ENTS DO NOT SHOW BREACHES OF THE SEPARATION AGREEM ENT THAT WOULD EXCUSE IT FROM PERFORM ING

### A.     Drapkin Did Not Breach Section 6(a)

The Company also attempts to avoid paying Drapkin what it owes by claiming that he violated Section 6(a) of the Separation Agreement. M&F alleges that Drapkin improperly retained documents, all of which were on the laptop of his assistant, Nancy Link.

The Company is unable to demonstrate any breach of Section 6(a) of the contract. Section 6(a) does not encompass documents retained on Link's laptop – the only documents Drapkin supposedly retained. Moreover, Drapkin's obligation to return documents under Section 6(a) could not be triggered without a request from the Company, and no such request was made. Accordingly, the Company's assertion that Drapkin breached Section 6(a) is entirely without merit.

Section 6(a) sets forth Drapkin's obligation to preserve the confidentiality of confidential information belonging to M&F and its affiliates, and prohibits his use, publication or dissemination of such information. The Company makes no claim at all of any use or dissemination of any information. The final sentence of subsection 6(a) provides that Drapkin agrees to "deliver promptly to the Company *at any time the Company may so request*" documents and data relating to the Company's business. R. 56.1 St., ¶ 75 (emphasis added). But, the Company made no such request. Drapkin testified that no one asked him to turn over any documents related to the Company or its affiliates. *Id.*, ¶ 16. This evidence has not been contradicted by the Company. Although Fasman claims to have spoken to Drapkin as a follow-up to signing the Separation Agreement, to determine whether Drapkin "had anything *he wanted to turn over*" (emphasis added), he does not claim to have requested that Drapkin return anything, nor to have requested the return of any document or category of documents. *Id.*, ¶¶ 77-

78.  According to Fasman, "that was it," and there were no other or more specific requests made to Drapkin.  *Id.*, ¶¶ 78-80.

Solely on the basis of this vague inquiry that Fasman alone claims to have made (but admits that he never documented, recorded or pursued), the Company asserts that Drapkin breached Section 6(a).  Fasman conceded that the statement in M&F's Complaint alleging that Drapkin "did not return anything" was based on his single, imprecise question concerning whether Drapkin had anything "he wanted to turn over." *Id.*, ¶ 79.[9]  Clearly, no request for the return of any documents or other materials was made under Section 6(a).

Further, the only documents at issue in this case are those that were located by forensic examination of the laptop computer of Drapkin's assistant, Nancy Link.  Section 6(a) has no application to materials in Link's possession, and makes no reference to such materials.  In contrast, Section 6(h), which also addresses Drapkin's obligation to return data to the Company, expressly refers to electronic files in the personal possession of Drapkin "or your personal assistant." *Id.*, ¶ 81.

This failure to refer to Link in Section 6(a) is assumed to be deliberate pursuant to the "maxim –*inclusio unius est exclusio alterius*,‒ which stands for the proposition that when certain language is omitted from one provision but placed in other provisions, it is assumed that the omission was intentional." *Global Crossing Bandwidth, Inc. v. PNG Telecomms., Inc.*, No. 06 Civ. 64157, 2008 WL 2079914, at *5-6 (W.D.N.Y. May 15, 2008) (citing *Sterling Investor Servs.,*

---

[9] M&F's allegation that Drapkin "did not return anything" is demonstrably false in any event, as it concedes that Drapkin turned over his desktop computer with its contents before he left.  R. 56.1 ¶ 113.  Moreover, the Company retained possession of the e-mails (with attachments) contained in Drapkin's e-mail account when he left the Company.  *Id.*, ¶¶ 87, 118-119.

*Inc. v. 1155 Nobo Assocs., LLC,* 30 A.D.3d 579, 818 N.Y.S.2d 513 (2d Dep't 2006)).  Given that

the only documents at issue were in Link's possession, Section 6(a) is entirely inapplicable.

### B.        Drapkin Did Not Breach Section 6(h)

To avoid its obligation to pay $18 million to Drapkin, the Company seizes upon yet

another trivial document issue.  Based upon documents largely identified through forensic

examination of the Link laptop during discovery, the Company claims that Drapkin breached

Section 6(h) of the Separation Agreement.  This contention should be rejected for what it is – a

trumped-up excuse to evade the Company's payment obligations.  The Company is unable to

provide any evidence of not one, but two of the essential elements of its claim regarding Section

6(h).  Except for a handful of documents, the Company cannot show that the documents at issue

were even on the Link Laptop when Drapkin and Link left M&F, nor can the Company show

that any of the documents at issue were not available to it from other sources.  Moreover, even if

Link's inadvertent retention of a few documents were a technical breach of Section 6(h), it could

not constitute a material breach that could excuse payment of $18 million.

### 1.        Section 6(h) Applies as of the Time of Drapkin's Departure

Section 6(h) states that Drapkin must provide the Company with copies of *electronic*

documents in "[his] (or [his] personal assistant's) personal possession" that are, *inter alia*, "not

otherwise available to the Company."  R. 56.1 St., ¶ 81.  The only electronic documents at issue

are those that were located on Link's laptop.  Section 6(h) clearly requires return only of

documents that were otherwise unavailable to the Company at the time of Drapkin's departure.

Any other reading would be absurdly overbroad, potentially obligating Drapkin if he or Link

possessed documents, at the time of their departure, that *were* available to the Company at that

time but which later ceased to be available to the Company for  whatever reason.  *See U.S. Bank*

*Nat'l Ass'n v. Southwest Airline Co.*, No. 07 Civ. 11131, 2009 WL 2163594, at *7 (S.D.N.Y.

July 20, 2009); *DeSouza v. P.L.U.S.F.U.N.D.S Group., Inc.,* No. 05 Civ. 5990, 2007 WL 4287745, at *3 (S.D.N.Y. Dec. 7, 2007) (dismissing breach of contract complaint where plaintiff's interpretation of the contract led to absurd results).

Put another way, to prevail on its Section 6(h) claim, the Company must show, among other things, that the documents about which it now complains were (i) not "otherwise available" to it when Drapkin left and (ii) that Drapkin or Link personally possessed the documents at that time. It cannot. As explained below, the Company offers nothing more than conjecture and speculation concerning what electronic files were on Link's laptop when she and Drapkin left M&F and cannot rebut evidence that all such files were otherwise available to it. Since the Company is unable to provide any evidence of two essential elements of its claim, summary judgment in favor of Drapkin is appropriate. *See Bouchard v. New York Archdiocese,* No. 04 Civ. 997, 2010 WL 1173001, at *3 (S.D.N.Y. Mar. 24, 2010) (internal citation omitted) (where movant can show dearth of evidence as to an essential element of nonmovant's claim, speculation will not suffice to defeat summary judgment).

### 2. The Company Cannot Show that the Documents Were Not "Otherwise Available"

There is no mystery to the term "otherwise available to the Company" – it clearly restricts the universe of documents to which Section 6(h) applies to those documents that are not "accessible" or "obtainable" by the Company from a source other than Drapkin. *See Merriam-Webster Dictionary* 150 (3d ed. 1986). Thus, Section 6(h) required return of information found on the Link laptop only if the Company did not have its own copies or could not have obtained these documents from another source at the time Drapkin left the Company. Proving this is the burden the Company bears, a burden it cannot meet because of its own actions and negligence.

Annex C to the Separation Agreement lists various electronic devices that Drapkin was

obligated to return to the Company, including the desktop computer Drapkin used at his office at the Company ("Drapkin's computer"). *See* R. 56.1 St., ¶¶ 83 & 85. The Company concedes that Drapkin returned his computer to the Company when he left. *Id.*, ¶ 113. But, the Company cannot identify what files remained on Drapkin's computer because, from the day Drapkin left the Company through the date of this motion, the Company never reviewed, inventoried or identified the contents of Drapkin's computer. *Id.*, ¶ 114. Indeed, the Company is unable to identify any such contents because it (i) cannot locate Drapkin's computer and (ii) speculates that it erased the contents of Drapkin's computer without reviewing them. *Id.*, ¶¶ 114-115. Thus, while the Company feigns outrage that Link allegedly retained these documents improperly, it was totally unconcerned to review or record what documents Drapkin returned and, as a direct result of its own actions, it can *never* prove that it did not have these files.

Moreover, the Company cannot even attest to which of the e-mails and other documents found on the Link laptop are currently unavailable to it because it has conducted no meaningful search for them. There is no evidence that the Company has made a comprehensive search of its files or servers to determine whether they contain these e-mails and other documents; nor is there any evidence in the record that the Company confirmed with its subsidiaries or affiliates that they do not have these documents. Moreover, the Company's forensic expert in this litigation made no effort to determine whether these documents exist or existed on the Company's server. *Id.*, ¶ 138. The Company's conscious avoidance of this knowledge is perhaps best illustrated by the testimony of its 30(b)(6) witness, Fasman. He baldly asserted that the Company does not have documents related to a corporate transaction *that was completed and consummated while Drapkin was still at the Company*; however, he concedes that beyond eye-balling the documents and reviewing his own files, no search was done for these documents. *Id.*, ¶ 135. Incredibly, the

reason for this inertia is that Fasman felt it was not necessary to do so. *Id.* If the Company considered the documents found on the Link laptop to be at all important, it would have sought to determine the extent to which it had copies – which it has never done.

In fact, what evidence there is indicates that the Company *did* have access to these documents. The overwhelming bulk of the documents at issue are e-mails from the Company's e-mail system found in two files on the Link laptop. *Id.*, ¶ 120. The latest date of any of the e-mails found on the Link laptop is April 16, 2007. *Id.*, ¶ 121. The undisputed record shows that through that date and beyond, the Company had as much (or more) access to these e-mails as Drapkin did. Drapkin's and Link's e-mail accounts at the Company remained active as late as May 12, 2008. Under Section 6(h), the Company agreed to forward to Drapkin and Link any e-mails sent to their M&F e-mail addresses for two years from the effective date of the Separation Agreement. *Id.*, ¶ 82. Moreover, Drapkin was permitted to use his Company e-mail account until December 31, 2007, and the Company was still considering whether to close Drapkin's and Link's e-mail accounts as late as May 12, 2008. *Id.*, ¶¶ 118-19. Given that Company employees could access their e-mails via the Internet, and Drapkin's account remained active after he left the Company, it is readily apparent that the e-mails were housed on the Company's server. Finally, the evidence shows these e-mails would not have been deleted from the Company's servers; the Company's expert himself states that the e-mails produced from the Link laptop were organized into identifiable folders and e-mails in Outlook subfolders were protected from the Company's automatic deletion process. *Id.*, ¶¶ 92-93 & 123.

Similarly, among the documents found on the Link laptop are 79 other documents (the "Other Documents"). *Id.*, ¶ 120. Even a cursory review of the Other Documents suggests that the Company would have possessed most, if not all, of them. For example, several of these

documents are inconsequential notes addressed to Perelman or Schwartz; others are agendas and attendee lists for meetings that Perelman and/or other Company employees were expected to attend. *Id.*, ¶¶ 129-30. Others are copies of American Express gift check requests made by Drapkin that list the Company on the forms. *Id.*, ¶ 132. Beyond conclusory assertions, the Company offers no credible evidence that it would not and did not have access to such documents.

At bottom, the Company's own actions (or omissions) preclude it from making the required showing that the documents produced from the Link laptop were not "otherwise available" to it. The lack of evidence for this essential element in support of the Company's Section 6(h) claim is fatal to that claim. Summary judgment should be granted in favor of Drapkin on this issue.

### 3. The Company Cannot Show that the Documents Were in Link's or Drapkin's Personal Possession at the Time of their Departure

Similarly, the Company has set forth no evidence suggesting that the documents produced from the Link laptop were in Link's (much less Drapkin's) personal possession at the time she and Drapkin left the Company. The Company emphasizes that e-mails related to the Company or its affiliates were produced from the Link laptop during discovery; it is Link's possession of these documents at the time she left the Company, however, that would be the *sine qua non* of a Section 6(h) breach (if there otherwise were evidence of such a breach). After laborious forensic analysis, however, the best the Company can do is speculate (based on no evidence whatsoever) that these e-mails *might have been* present at that time. But the Company bears the burden to show that, under Section 6(h), these documents were in Drapkin or Link's "personal possession." The Company's failure and inability to adduce any evidence on this point warrants granting Drapkin's summary judgment motion.

The relevant e-mails were located in two files on the Link laptop (the ".pst files").  *See* R. 56.1 St., ¶ 122.  The .pst files were created at 11:00 pm on July 8, 2007, more than two months after Drapkin's departure.  *Id.*, ¶ 124.  Just three minutes before, on that same day, an 80 gigabyte Western Digital external hard drive was attached to the Link laptop (the "WD hard drive").  *Id.*, ¶ 125.  It is undisputed that the WD hard drive was connected to the Link laptop only once but that Link used the backup drive given to her by M&F on more than one occasion.  *Id.*, ¶¶ 123 & 126.[10]

Thus the e-mails at issue resided in the .pst files that were created on the Link laptop only *after* Link left the Company.  Moreover, the only rational reading of the available evidence suggests that the .pst files were transferred to the Link laptop from the WD hard drive *and* that the WD hard drive was not the backup device used by Link.  But, instead of providing evidence to undercut this logical inference, the Company offers guesses:  its expert speculates, without any evidence at all, that e-mails "could have been" moved into the .pst files from another location on the Link laptop.  *Id.*, ¶ 128.  Yet, even this shot in the dark is contradicted by the record.  For example, the conjecture that e-mails could have been added to the .pst files from another source on the Link laptop is contradicted by the lack of disparity in the size of the .pst files between the time when they were created and the time of the forensic analysis.  *Id.*, ¶ 127.  Put simply, the e-mails resided in two files on the Link laptop that were created two months *after* she left the Company.  The Company has no evidence at all to show that Link possessed any of these documents when she left the Company.  As such, the Company cannot show yet another

---

[10] As noted above, Link occasionally, and without Drapkin's knowledge, backed up her hard drive to a different storage device that M&F had provided to her.  She discarded that device after it stopped working, but there is no evidence that Link's backup device was the source from which the e-mail files at issue were placed on the Link laptop.  The purpose of the device was to store what was already on the laptop, not to add material to its contents.

essential element of its Section 6(h) claim and summary judgment in favor of Drapkin is appropriate.

## C.     <u>Unwitting Retention of the Other Documents is Not a Material Breach</u>

The failure to provide a scrap of evidence as to the two elements just discussed dooms the Company's Section 6(h) claims, particularly with respect to the e-mails found in the .pst files. Even assuming, with respect to the Other Documents, that they were not otherwise available to the Company and that their presence on the Link laptop at the time of Drapkin's departure from the Company therefore triggered Drapkin's Section 6(h) obligations, the trivial nature of this alleged breach reveals the Company's claims for the sham that they are. In essence, the Company contends that the inadvertent retention of 79 largely inconsequential documents excuses the Company's obligation to pay Drapkin $18 million and justifies rescission of the Separation Agreement. It does not. Link's inadvertent retention of these documents (among the thousands of files on the laptop) is not a material breach that could be found to excuse the Company's performance. A party is excused from performing its obligations under a contract only where the other party's breach is "so substantial that it defeats the object of the parties in making the contract." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.,* 111 F.3d 284, 289 (2d Cir. 1997) (internal citation omitted). A material breach is one that "go[es] to the root of the agreement between the parties." *Id.* (internal citation and quotation omitted). The materiality of a breach is a question of law to be decided by the Court. *See id.* at 289; *Wechsler v. Hunt Health Sys., Ltd.*, 186 F. Supp. 2d 402, 413 (S.D.N.Y. 2002).

Applying this standard, the presence of the Other Documents on the Link laptop simply does not rise to the level of a material breach. As noted, the Other Documents are largely inconsequential. Many of them are no more than simple notes sent from Drapkin to other Company employees, copies of American Express gift check receipts, or lists of attendees at

meetings that were held years before Drapkin's departure from M&F.  It is impossible to claim

that the return of such documents goes to the "root" of the Separation Agreement; rather, the

driving purpose of the Separation Agreement is to terminate rights Drapkin held under pre-

existing employment contracts in consideration for making the specified payments to him.  *See*

*In re Spectrum Info. Tech., Inc.*, 190 B.R. 741, 750 (Bankr. E.D.N.Y. 1996) (noting that the

purpose of a separation agreement was "the termination without cause of purportedly valid and

enforceable employment agreements").

Perhaps most importantly, Drapkin's alleged breach is not material because the Company

cannot show any injury at all from the inadvertent retention of any documents.  *See, generally,*

*Unigard Sec. Ins. Co. v. North River Ins. Co.,* 79 N.Y.2d 576, 584, 584 N.Y.S.2d 290, 294, 594

N.E.2d 571, 575 (1992) (under general contract principles, performance is not excused where the

breach is not "demonstrably prejudicial"); *see also Dun & Bradstreet Corp. v. HarperCollins*

*Publishers*, 872 F. Supp. 103, 110 (S.D.N.Y. 1995) (Kaplan, *J.*) (inadvertent breach that caused

no injury was not material).  In *Grassi & Co. v. Janover Rubincott, LLC,* No. 015743/2008, 2009

WL 3813764 (N.Y. Sup. Ct. Nassau County Oct. 26, 2009), the court confronted and rejected

similar claims.  There, a company alleged that former employees breached a separation

agreement by retaining hard drives and laptops upon which company documents were located

and *delivering the documents to a competitor*.  *Id.* at *12.  Granting that there may have been a

technical breach of the contract, the court found the claim "inconsequential" as the competitor

had gained no economic advantage from the documents and the former employees had not

misappropriated any proprietary information.  *Id.*  The inconsequential nature of Drapkin's

breach is even more evident.  He was unaware of these documents when he left M&F.  R. 56.1

St., ¶ 133.  Moreover, the Company does not allege that Drapkin: (i) disclosed the documents to

anyone; (ii) failed to keep them confidential, or (iii) made any use of the documents or information contained in them whatsoever. *Id.*, ¶¶ 139-141.

In short, the Company's claims under Section 6(h) are much ado about nothing; it has been deprived of nothing by Drapkin's alleged breach. However couched, the failure to return a small number of inconsequential documents cannot be a valid basis for withholding $18 million and seeking rescission of the Separation Agreement.

## III.  THERE IS NO ADMISSIBLE EVIDENCE OF ANY DISPARAGEMENT

In its attempt to conjure up potential breaches of the Separation and Stock Purchase Agreements, the Company now apparently contends that Drapkin disparaged the Company and Perelman, in violation of Section 5 of the Separation Agreement. The purported disparagement supposedly occurred in the summer of 2007, within weeks of Drapkin's departure, but the Company made no mention of it until this litigation was well underway.[11] This belatedly concocted argument fares no better than the Company's other claims, for it is based on a deliberate refusal to give full effect to the language of Section 5. As a result, any disparagement-

---

[11] The Company made no mention at all of this alleged disparagement or Eric Rose, the central figure in this alleged disparagement, in its pleadings, initial disclosures, or interrogatory responses. Nor did the Company ever amend its discovery responses to refer to Rose. *See* R. 56.1 St., ¶¶ 162-65. The Company's employees have contradicted each other as to when the Company learned of this alleged disparagement, with Fasman testifying that the Company learned of it "shortly after it occurred" and Rose claiming never to have reported it to anyone at the Company until after the start of this litigation. *Id.*, ¶¶ 157-58. Whatever the truth, it is clear that the Company could have, but did not, amend its discovery responses seasonably to disclose its intention to rely upon Rose, as required by Fed. R. Civ. P. 26. *See Id.,* Ex. 37. Thus, the Company should not be permitted to rely on Rose to provide evidence on this motion. *See Pal v. New York University*, No. 06 Civ. 5892, 2008 WL 2627614, at *4 (S.D.N.Y. June 30, 2008); *Schiller v. City of New York*, No. 04 Civ. 7922, 2008 WL 4525341, at *5 (S.D.N.Y. Oct. 9, 2008); *Alfano v. Nat'l Geo. Channel*, No. 06 Civ. 3511, 2007 WL 2982757, at *1 (E.D.N.Y. Oct. 5, 2007); *Fleming v. Verizon New York Inc.,* No. 03 Civ. 5639, 2006 WL 2709766, at *7 (S.D.N.Y. Sept. 22, 2006). Because Rose's testimony is the only otherwise competent evidence offered in support of the Company's disparagement claim, summary judgment on this issue in Drapkin's favor is proper.

based claims should be rejected and Drapkin should be granted summary judgment on his breach of contract claims.

### A.    <u>There Is No Evidence of a Breach of Section 5</u>

Section 5 of the Separation Agreement provides:

> You agree not to take any action or to make any statement that *does, or is reasonably likely to, enter the public domain* and disparages the business or management of the Company or any of the Company's affiliates, or any of its Related Persons, with respect to any period during which you were either employed by the Company or receive benefits under this Agreement. The Company agrees that it shall not instruct or authorize any directors, officers, agents, or employees of the Company or any of the Company's affiliates or any of its Related Persons to take any action or make any statement, written or oral, that disparages or criticizes you. . . . Upon receipt by either party of written notice of any breach of this Section 5, the party receiving such notice shall have a period of 10 days to respond to and cure any such breach.

R. 56.1 St., ¶¶ 142-43 & Ex. 24, § 5 (emphasis added).

Despite issuing shotgun subpoenas to over a dozen of Drapkin's friends, business associates, and family members, the only alleged incident of disparagement to which the Company points is an alleged conversation between Drapkin and Rose in May 2007, two weeks after Drapkin's departure. *See Id*., ¶¶ 144, 148 & 151. Rose is the Company's executive vice president of life sciences, a position to which he was recruited by Drapkin in early 2007. *Id*., ¶¶ 144-48. Rose remains in that position today. *Id*., ¶ 161.

According to Rose, on May 14, 2007, he and Drapkin had dinner at Quality Meats restaurant; at the time, the two men were still close friends. *Id*., ¶¶ 148 & 150. No one else was present at this dinner. *Id*., ¶ 149. Rose testified that, for fifteen or twenty minutes over the course of a much longer dinner, Drapkin made "denigrating" comments about Perelman (although Rose could not remember a single comment or even the substance of these comments). R. 56.1 St., ¶¶ 151 & 154. Rose claims Drapkin told him that Perelman and M&F were "not interested in life sciences," and that "as a career opportunity for [Rose]í this was going to be

disastrous." *Id.*, ¶ 153.

Despite Rose's claim of being "personally frightened" by the statements Drapkin allegedly made, the only person with whom Rose discussed the Quality Meats conversation was his wife. *Id.*, ¶¶ 155-56. Rose never brought this alleged disparagement to the attention of anyone at the Company (*see Id.*, ¶ 157), at least not until the Company began to cast about for any reason, regardless of whether it was fabricated, to deny Drapkin his funds in 2009. Moreover, beyond raising his "personal antennae," Rose did not change his behavior after the alleged Quality Meats conversation. *Id.*, ¶ 159.

## 1. The Company Failed to Give Notice of Breach, as Required

Initially, Section 5 of the Separation Agreement requires a party alleging disparagement to give ten days notice and an opportunity to cure to the opposing party. R. 56.1 St., ¶ 143. The Company never gave Drapkin any notice of any incident of alleged disparagement. *Id.*, ¶ 162. Having failed to satisfy this condition precedent, the Company cannot now complain that Drapkin breached Section 5. *Cf. Great Canal Realty Corp. v. Seneca Ins. Co.,* 5 N.Y.3d 742, 743, 800 N.Y.S.2d 521, 522, 833 N.E.2d 1196, 1197 (2005) (insured's failure to give notice of an incident, which was a "condition precedent," excused the insurer's performance under the policy).

## 2. No Alleged Disparagement Entered or Was Likely to Enter the Public Domain

In addition, any disparagement claim must be rejected because it is based on an interpretation of the contractual language that conflicts with basic principles of contractual interpretation. Under the express contractual language, to be prohibited by Section 5, any alleged disparagement by Drapkin must enter, or be reasonably likely to enter, the "public domain." R. 56.1 St., ¶ 142. In contrast, Section 5 places no such "public domain" limitation on

disparagement by the Company of Drapkin.  *Id.*

Even accepting, for purposes of this motion only, the Company's position that Drapkin's alleged comments might have been disparaging, the Company's disparagement claim fails because the alleged disparagement never entered into, nor was it reasonably likely to enter into, the public domain.  By necessity, the Company's position is founded on a faulty premise: that an intimate dinner conversation between two close friends is in, or reasonably likely to enter, the public domain.  This premise should be rejected, however, because it violates two basic tenets of contractual interpretation under New York law: (i) it does not accord the contractual terms their ordinary and plain meaning, and (ii) it leads to absurd results.  *Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006).

Unsurprisingly, as generally understood, the term "public domain" requires dissemination to the *public*.  *See, e.g., Weaver v. Chrysler Corp.,* 172 F.R.D. 96, 101 (S.D.N.Y. 1997) (fraudulent statements were in the "public domain" because they had been disseminated to the general public); *United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 323 (2d Cir. 1992) (*qui tam* suit barred by information that was in the "public domain" because it had been disseminated to the general public); *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979) (information that is "publicly revealed" is in the "public domain").  According to Rose himself, the alleged disparagement took place at a dinner for two friends, a quintessentially private gathering.  Moreover, the private and inconsequential nature of whatever was said at this dinner is confirmed by the fact that Rose told only his wife about the conversation.  It is ludicrous to interpret the word "public" to mean "private"; yet, this is precisely what the Company would have the Court do.

Nor is there evidence suggesting that the alleged disparagement was "reasonably likely to

enter the public domain." As Rose unequivocally testified, he and Drapkin were the only parties to the conversation; thus, the only way this conversation would enter the public domain is if Rose himself disclosed its contents to the public. Given that Rose was not only a friend of Drapkin's, but also the M&F executive in charge of its life sciences investments, it was not "reasonably likely" that he would share Drapkin's alleged view that the Company was uninterested in life sciences with the world. Furthermore, it is nonsensical to contend that communications by Drapkin with a Company employee are reasonably likely to enter the public domain; if this were so, the Company could simply publicize any complaint about the Company Drapkin makes to a Company employee— as he did to Fasman— and claim that Drapkin breached Section 5. Such an absurd reading should be rejected.

Of course, it is doubtful that the alleged conversation— which consists of nothing more than friendly advice and stale venting— constitutes disparagement within the meaning of the contract. Even according to Rose, the vast majority of what Drapkin is alleged to have said was not new to him. *See* R. 56.1 St., ¶ 160. Indeed, Rose acknowledged that he himself had already borne witness to Perelman's irrationality and that Drapkin and Perelman's relationship had deteriorated to the point that Rose felt it was better for the health of both men for them to separate. *See Id.*, ¶¶ 146-47. Merely reiterating old complaints about a mutual acquaintance to a close friend who has heard them all before does not further demean that acquaintance. Similarly, there is nothing demeaning about Drapkin's alleged opinion that the Company, a holding company with varied interests, did not care about life sciences. Regardless, even if these statements were disparaging, they did not enter the public domain, nor were they reasonably likely to do so.

## CONCLUSION

For the foregoing reasons, Drapkin's motion for summary judgment should be granted

and Mafco's counterclaim and defenses involving breach of the Separation Agreement and Stock

Purchase Agreement should be dismissed.

New York, New York                              Respectfully Submitted,
June 30, 2010
                                                MORVILLO, ABRAMOWITZ, GRAND,
                                                IASON, ANELLO & BOHRER, P.C.


                                                By: /s Thomas M. Keane
                                                    Elkan Abramowitz
                                                    Thomas M. Keane
                                                    Sidhardha Karamaju
                                                    Gretchan Ohlig
                                                565 Fifth Avenue
                                                New York, New York 10017
                                                (212) 856-9600

                                                HOGAN LOVELLS US LLP


                                                By: /s David Dunn
                                                    David Dunn
                                                    Christine Wagner
                                                875 Third Avenue
                                                New York, New York 10022
                                                (212) 918-3000

                                                *Attorneys for Donald G. Drapkin*