CONFIDENTIAL UNDER COURT ORDER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

\----------------------------------------------------------X

|  |  |  |
|---|---|---|
| | : | |
| DONALD G. DRAPKIN, | : | |
| | : | 09 Civ. 1285 (PGG) |
| *Plaintiff and Counterclaim Defendant,* | : | |
| | : | ECF Case |
| -against- | : | |
| | : | |
| MAFCO CONSOLIDATED GROUP, INC., | : | **ORAL ARGUMENT** |
| | : | **REQUESTED** |
| *Defendant and Counterclaim Plaintiff.* | : | |
| | : | |

\----------------------------------------------------------X

# MEMORANDUM OF LAW IN OPPOSITION TO DONALD G. DRAPKIN'S MOTION FOR SUMMARY JUDGMENT

KOBRE & KIM LLP
Steven G. Kobre
Steven W. Perlstein
Jonathan D. Cogan
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200

*Attorneys for MacAndrews & Forbes LLC*
*and Mafco Consolidated Group, Inc.*

CONFIDENTIAL UNDER COURT ORDER

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................. 1

**THE COMPANY'S STATEMENT OF FACTS** .......................................... 4

    **I.**   **Because of His Poor Performance, Drapkin Was Required to Leave the Company and Enter into a Separation Agreement.** ........................................ 4

    **II.**  **Shortly After His Departure, Drapkin Attempted to Influence Dr. Eric Rose to Leave the Company.** ............................................................. 5

    **III.** **Drapkin Disparaged the Company and Its Executives.** ................... 7

    **IV.** **Drapkin Retained, Failed to Return, and Failed to Delete Documents and Information Belonging to the Company.** ........................................ 9

        **A.**  **Nancy Link, Drapkin's Agent, Was Responsible For Maintaining All of Drapkin's Documents** .................................................. 9

        **B.**  **Drapkin's Obligations under the Separation Agreement Regarding the Return and Deletion of Documents.** .................................. 11

        **C.**  **Drapkin's Instructions to Link Regarding the Return and Deletion of Documents and Her Efforts to Comply Were Patently Insufficient** .......... 12

    **V.**   **Drapkin Improperly Sought Health Insurance Benefits.** ................. 14

**ARGUMENT** ........................................................................................... 16

    **I.**   **Legal Standard.** ........................................................................ 16

        **A.**  **The Issue of Materiality is a Fact Issue for the Jury.** .................. 17

        **B.**  **Summary Judgment Is Inappropriate Where Contractual Terms Are Ambiguous.** ........................................................................ 18

    **II.**  **There Are Triable Issues of Material Fact Regarding Whether Drapkin Materially Breached Section 6(c) of the Separation Agreement.** .................. 19

        **A.**  **Drapkin Materially Breached Section 6(c).** .................................. 19

        **B.**  **The Issue of Drapkin's Material Breach of Section 6(c) Is Part of This Case.** ........................................................................... 21

    **III.** **Drapkin Breached Section 5 of the Separation Agreement.** ........... 23

    **IV.** **Drapkin Breached Section 6(a) of the Separation Agreement.** ....... 26

**A.** **Section 6(a) Required Drapkin to Return Documents in His Possession or Under His Control.** .......................................................................................... 26

**B.** **The Company Requested the Return of Documents.** .................................... 29

**V.** **Drapkin Breached Section 6(h) of the Separation Agreement.** ...................... 30

**A.** **Section 6(h) Applies to Files on the External Drive Retained By Link.** ....... 31

**B.** **Section 6(h) Required Drapkin to Delete (and Not Attempt to Recover) All Electronic Company Files in His or Nancy Link's Possession.** .................... 32

**C.** **Drapkin Failed to Delete (or Attempted to Recover) Thousands of Company Documents.** .................................................................................. 34

**VI.** **An Adverse Inference Should Be Drawn Against Drapkin Because Link Discarded Evidence After the Obligation to Preserve Arose.** ......................... 34

**VII.** **Drapkin Breached Section 3(b) of the Separation Agreement.** ...................... 37

**<u>CONCLUSION</u>** ...................................................................................... 39

**<u>TABLE OF AUTHORITIES</u>**

**Cases**

*Adickes v. S.H. Kress & Co.*
  398 U.S. 144 (1970) ............................................................................................ 17
*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 (1986) ............................................................................................ 17
*Bear Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*
  361 F. Supp. 2d 283 (S.D.N.Y. 2005) ........................................................... 18, 19
*Bronson v. Kelchner*
  No. 07-1191(ARH), 2008 WL 5397759 (W.D. Pa. Dec. 23, 2008) ............................ 28
*Bryan v. Bartlett*
  435 F.2d 28 (8th Cir. 1970) .................................................................................. 28
*Case Boring Corp. v. Venditti Constructors, Inc.*
  360 N.Y.S. 2d 750 (4th Dep't 1974) ...................................................................... 18
*Chambers v. TRM Copy Ctrs. Corp.*
  43 F.3d 29 (2d. Cir. 1994). .................................................................................. 17
*deBrossard v. Van Norden*
  495 N.Y.S. 2d 369 (1st Dep't.1985) ...................................................................... 26
*Dopp v. Pritzker*
  38 F.3d 1239 (1st Cir. 1994) ................................................................................ 18
*Eye Assoc., P.C. v. IncomRX Sys., L.P.*
  912 F.2d 23 (2d Cir. 1990) .................................................................................. 19
*G.D. Searle & Co. v. Medicore Commc'ns., Inc.*
  843 F. Supp. 895 (S.D.N.Y. 1994) ........................................................................ 28
*Hayes v. N.Y. City Dep't of Corr.*
  84 F.3d 614 (2d Cir. 1996) ............................................................................. 17, 19
*Hicksville Mach. Works Corp. v. Eagle Precision, Inc.*
  635 N.Y.S.2d 300 (2d Dep't 1995) ........................................................................ 25
*Highland Capital Mgmt., L.P. v. Schneider*
  551 F. Supp. 2d 173 (S.D.N.Y. 2008) .................................................................... 22
*Kronisch v. United States*
  150 F.3d 112 (2d Cir. 1998) ........................................................................... 35, 37
*LaSalle Bank N.A. v. Nomura Asset Capital Corp.*
  424 F.3d 195 (2d Cir. 2005) ........................................................................... 18, 37
*Long Island Airports Limousine Serv. Corp. v. Playboy-Elsinore Assocs*
  739 F.2d 101 (2d Cir. 1984) ........................................................................... 18, 26
*Muzak Corp. v. Hotel Taft Corp.*
  133 N.E.2d. 688 (N.Y. 1956) ................................................................................ 26
*Niagara Mohawk Power Corp. v. Jones Chem., Inc.*
  315 F.3d 171 (2d Cir. 2003) ................................................................................ 17
*Point Prods. A.G. v. Sony Music Entm't Inc.*
   No. 93 Civ. 4001(NRB),  2000 WL 1006236 (S.D.N.Y. July 20, 2000) ..................... 25
*Premier Bank v. Cohen-Esry Props., Inc.*
  859 F. Supp. 1388 (D. Kan. 1994) ........................................................................ 28
*Rule v. Brine, Inc.*

85 F.3d 1002 (2d Cir. 1996)........................................................................ 17, 19, 30

*Schering Corp. v. Home Insurance Co.*
712 F.2d 4 (2d Cir. 1983) ................................................................................ 18

*Sea Tow Servs. Intern., Inc. v. Pontin*
607 F. Supp. 2d 378 (E.D.N.Y. 2009) ............................................................. 24

*Shaw Grp., Inc. v. Triplefine Int'l Corp.*
322 F.3d 115 (2d Cir. 2003)............................................................................. 27

*St. Paul Fire & Marine Ins. Co. v. Heath Fielding Ins. Broking Ltd.*
91 Civ. 0748(MJL), 1996 WL19028 (S.D.N.Y. Jan. 17, 1996) ..................... 23

*Teachers Ins. and Annuity Ass'n of America v. Coaxial Commc'ns of Cent. Ohio, Inc.*
807 F. Supp. 1155 (S.D.N.Y. 1992)................................................................. 18

*United States  v. Stein*
488 F. Supp. 2d 350 (S.D.N.Y. 2007)............................................................. 28

*Wechsler v. Hunt Health Sys., Ltd.*
186 F. Supp. 2d 402 (S.D.N.Y. 2002)............................................................. 18

**Other Authorities**

2 E. Allan Farnsworth, *Farnsworth on Contracts*,  § 8.16, at 443 (1990)....................... 18

James W. Moore *et al., Moore's Federal Practice*, ¶ 15.08[2] at 15-48-49 and cases cited
therein (2d ed. 1995) ........................................................................................ 23

**Rules**

Fed. R. Civ. P. 56(c) ............................................................................................ 17

CONFIDENTIAL UNDER COURT ORDER

MacAndrews & Forbes LLC and Mafco Consolidated Group, Inc. (together, the "Company") submit this memorandum in opposition to Donald Drapkin's motion for summary judgment.[1]

## PRELIMINARY STATEMENT

Donald Drapkin was employed by the Company as a Vice Chairman for twenty years until he left in 2007.  When he departed, Drapkin and the Company agreed to a single separation package, although it was reflected in several agreements due to the various ways in which Drapkin had been compensated by the Company.  Under those contracts, the Company agreed to pay Drapkin millions of dollars in exchange for Drapkin's promises, among other things, (1) not to disparage it; (2) not to attempt to influence any of its employees to leave; and (3) to return and not retain Company materials.  Drapkin did not keep those promises.  The Company and Drapkin sued each other for breach of contract.  Drapkin now seeks summary judgment that he is entitled to payment of the millions of dollars he would have received if he had upheld his end of the bargain.  However, he has neither refuted the existence of material fact issues nor otherwise demonstrated that he is entitled to summary judgment.

*First*, even if everything Drapkin argued in his motion were correct (which it is not), he would not be entitled to summary judgment because his motion fails to address the Company's claim that he attempted to influence an important employee to leave the Company.  For this reason alone, Drapkin's motion must be denied.

*Second,* Drapkin is not entitled to summary judgment because he repeatedly breached the non-disparagement clause of his separation agreement with the Company.

---

[1] Drapkin's Memorandum of Law In Support of His Motion for Summary Judgment is referred to herein as the "Drapkin Mem."

Drapkin argues that the Company's disparagement claim is unsupported because the Company did not give him notice and opportunity to cure disparaging statements and because those statements allegedly did not enter, or were not likely to enter, the "public domain" (as Drapkin now construes that contract term).   Summary judgment as to the disparagement claim, however, is unavailable because (1) the notice and cure provisions are inapplicable as a matter of law; and (2) it is a question for the jury to decide whether, based on all the relevant facts and circumstances, the disparaging statements Drapkin made were likely to enter the "public domain" within the meaning that the parties intended (and because, in any event, the meaning of "public domain" is not properly resolved on summary judgment).

*Third,* Drapkin is not entitled to summary judgment because he retained ***thousands of Company-related documents***, many of which are confidential, that he was prohibited from keeping under his separation agreement.   Drapkin argues that he did not improperly retain Company documents and files because (1) the files were retained, not by him personally, but by his assistant who accompanied him to Lazard; (2) the Company allegedly never asked him to return anything; (3) he was not obliged to return any files unless they were not otherwise available to the Company, and (4) neither Drapkin nor his assistant allegedly possessed any Company documents at the time they left the Company.

Summary judgment as to the document retention claim, however, is unavailable because (1) Drapkin's obligations applied to materials under his control (and not just in his personal possession), including those retained by his assistant, who is very obviously Drapkin's agent; (2) there is a classic factual dispute that cannot be resolved on summary judgment regarding whether the Company asked him to return documents (*i.e.*, a

Company witness testified to having made the request, while Drapkin claims it never happened); and (3) Drapkin's assistant was, in fact, in possession of thousands of documents related to the Company or its affiliates.  Further, Drapkin does not even address his independent contractual obligation to delete documents related to the Company or its affiliates, whether or not they were otherwise available to the Company. There are unresolved genuine issues of material fact, including directly conflicting testimony, that preclude summary judgment on the file retention claim.

*Fourth,* Drapkin is not entitled to summary judgment because he materially breached the health insurance section of his separation agreement, as well as the related covenant of good faith and fair dealing, by intentionally declining to obtain available health insurance through Lazard and instead electing to have all of his and his family's insurable medical expenses paid by the Company's medical plan.

Drapkin further argues that his breaches of contract were not material, but the question of materiality here is not properly decided on summary judgment. And, in any event, Drapkin has not marshaled sufficient evidence that his breaches were immaterial.

Because a reasonable fact-finder could conclude that Drapkin materially breached his separation agreement with the Company, Drapkin's motion for summary judgment should be denied.

## THE COMPANY'S STATEMENT OF FACTS

I.     **Because of His Poor Performance, Drapkin Was Required to Leave the Company and Enter into a Separation Agreement.**

Drapkin was employed as a Vice Chairman of the Company from 1987 through April 2007.  R. 56.1 Stmts., ¶¶ 10, 22.[2]  During at least the last five or so years of that employment, Drapkin became increasingly inattentive to his work.  *Id.*, ¶ 166.  Given his diminishing level of interest and performance, in April 2006, Drapkin and the Company entered into an agreement whereby, beginning on January 1, 2008, he would spend only half of his time working on Company business and his compensation would decrease from almost $15 million per year to approximately $7.5 million per year.  *Id.*, ¶¶ 167, 168 & Appx. Ex. 35.

However, only a year later, after the Company's chairman, Ronald O. Perelman, expressed dissatisfaction with Drapkin's performance, and despite Drapkin's part-time workload, Drapkin informed Perelman that he was no longer interested in working for the Company.  R. 56.1 Stmts., ¶ 169.  Drapkin and the Company agreed to negotiate a separation package.  *Id.*, ¶ 170.

Because the Company had compensated Drapkin through various payments, investment opportunities and other arrangements, Drapkin's separation package is reflected by several agreements, including a Separation Agreement and a Stock Purchase Agreement ("SPA").  R. 56.1 Appx. Ex. 24 & 34.  Pursuant to those contracts and in exchange for certain basic obligations on the part of Drapkin, the Company agreed to pay Drapkin approximately $27.5 million over a five-year period and to permit him to

---

[2] Pursuant to Rule 5 of Your Honor's Individual Practices, Drapkin and the Company set forth sequentially numbered Rule 56.1 Statements in support and in opposition of Donald Drapkin's Motion for Summary Judgment respectively ("R. 56.1 Stmts.").

continue participating in certain arrangements available to him by virtue of his employment by the Company.  R. 56.1 Stmts., ¶ 171.

In particular, the Company demanded, and Drapkin agreed to, certain material terms that required him to: (1) return and delete all Company materials; (2) refrain from disparaging the Company or its personnel; and (3) refrain from attempting to influence any Company employee to leave.  R. 56.1 Stmts., ¶ 172 & Appx. Ex. 24, §§ 5, 6(a), 6(c), 6(h).

The Separation Agreement made plain that the covenants set forth in Sections 5 and 6 (including the ones described in the paragraph above) were "material inducements causing the Company to enter into this [Separation] Agreement and that any material breach of those terms would enable the Company to rescind the agreements, reclaim the benefits provided to Drapkin thereunder, and stop performing."  R. 56.1 Stmts., ¶ 173 & Appx. Ex. 24, § 9.  Notwithstanding the many millions of dollars in benefits to which Drapkin could have been entitled, Drapkin repeatedly ignored and elected not to comply with the simple contractual obligations to which he agreed.

## II.    Shortly After His Departure, Drapkin Attempted to Influence Dr. Eric Rose to Leave the Company.

The Company – whose core business involves assessing investment opportunities and making investments of substantial sums based on these assessments – naturally places a premium on ensuring that it hires (and retains) the best possible talent.  To this end, Section 6(c) of the Separation Agreement prohibits Drapkin from attempting to influence any employee of the Company to leave the Company other than Nancy Link, his longtime assistant.  R. 56.1 Stmts., ¶ 174.  In pertinent part, Section 6(c) provides:

> For a period of two years from the date hereof, you shall not, directly or indirectly … induce or attempt to influence any employee of the Company

5

or its affiliates (other than Nancy Link) to terminate his or her employment with the Company.

*Id.*, ¶ 175.  In direct violation of that straightforward provision, only two weeks after Drapkin's departure from the Company, he attempted to influence Dr. Eric Rose, a key Company executive, to terminate his employment.[3]  *Id.*, ¶ 176.

That Drapkin would encourage Dr. Rose to leave the Company is particularly troubling because of Dr. Rose's professional stature and importance to the Company as the Executive Vice President of its Life Sciences division.  Some of Dr. Rose's most important credentials for purposes of his role at the Company are set forth in the accompanying Declaration of Dr. Rose, dated July 29, 2010.  In short, prior to his joining the Company, he had established himself as one of the foremost cardiac surgeons and as a pioneer in multiple fields including combating Alzheimer's disease and bioterrorism.  R. 56.1 Stmts., ¶ 177.  He was also Surgeon-in-Chief at New York-Presbyterian Hospital/Columbia and Chairman of the Department of Surgery at the Columbia University College of Physicians and Surgeons, where he held a distinguished professorship.  *Id.*

These credentials lent significant credibility to the Company's efforts to become a player in the life sciences mergers and acquisitions business.  R. 56.1 Stmts., ¶ 180.  Moreover, Dr. Rose has been critical in the effort to transform one of the Company's affiliates, SIGA Technologies, Inc., from a leading researcher in the development of anti-viral drugs directed at potential agents of bioterror into a commercial-stage company that is ready to deliver a ground-breaking new anti-viral therapeutic drug to the marketplace.

---

[3] While Drapkin initially suggested hiring Dr. Rose to the Company internally, Howard Gittis and Barry Schwartz were responsible for communicating with Dr. Rose about joining the Company and negotiating the details of his employment.  R. 56.1 Stmts., ¶¶ 178, 179.

*Id.*, ¶ 181.  During his time at the Company, Dr. Rose has also helped it secure more than

$100 million in federal funding to support its programs.   *Id.*, ¶ 182. Given all of this, the

Company considers Dr. Rose to be one of its most senior and valued executives, and, if

the Company were to lose his services, it would be a serious setback.  *Id.*, ¶ 183.

Among other negative comments (described in the section regarding

disparagement below), Drapkin told Dr. Rose that the Company had no genuine interest

in the life sciences – the business that Dr. Rose was specifically hired to manage – and

that his decision to work there would prove to be "disastrous" for his career.  R. 56.1

Stmts., ¶ 153.  The impact of those comments on Dr. Rose was significant.  *Id.*, ¶ 155.  At

the time, Dr. Rose regarded Drapkin as a close personal friend who, having worked at the

Company for twenty years, obviously knew much more about it than Dr. Rose did.  *Id.*, ¶

184.  As a result, he was "personally frightened" by what Drapkin had said.  *Id.*, ¶ 155.[4]

### III.        Drapkin Disparaged the Company and Its Executives.

Pursuant to Section 5 of the Separation Agreement, Drapkin agreed:

> not to take any action or to make any statement that does, or is reasonably
> likely to, enter the public domain and disparages the business or
> management of the Company or any of the Company's affiliates, or any of
> its Related Persons, with respect to any period during which you were
> either employed by the Company or receive benefits under this
> Agreement.[5]

---

[4] As discussed further below, Drapkin did not address the Section 6(c) breach in his moving papers, s*ee
generally* Drapkin Mem., even though he has long been on notice of that claim, which was (1) raised in a
declaration from Dr. Rose offered in support of the Company's opposition to Drapkin's motion to quash
certain subpoenas (R. 56.1 Stmts., ¶ 194); (2) raised in a Rule 30(b)(6) deposition referencing the
conversation with Dr. Rose as a breach of Section 6(c) (R. 56.1 Stmts., ¶ 198); (3) raised in the Company's
pre-motion letter (R. 56.1 Stmts., ¶ 199); and (4) discussed by Dr. Rose in his post-pre-hearing conference
deposition (R. 56.1 Stmts., ¶ 197).

[5] The Separation Agreement further defines "Related Persons" as:

> the Company, its parents, subsidiaries and affiliates, together with their respective present
> or former officers, directors, partners, shareholders, employees and agents, Ronald
> Perelman, his family and associates, and each of their predecessors, successors and

R. 56.1 Appx. Ex. 24, § 5.

In the context of this provision, the Company's 30(b)(6) witness testified that Drapkin and the Company intended "public domain" to mean the business community in which the Company and Drapkin operated, including individuals who work in that community such as deal makers, financiers and lawyers, among others. R. 56.1 Stmts., ¶ 185.

Despite that agreement, in the same conversation in which he tried to convince Dr. Rose to leave the Company, Drapkin denigrated Ronald Perelman as a person and denigrated the Company as a workplace. R. 56.1 Stmts., ¶ 186. Drapkin also made similar statements in Dr. Rose's presence to their mutual acquaintances at other times subsequent to Drapkin's departure from the Company. *Id.*, ¶ 187.

Drapkin's disparaging comments were not limited to his conversations with Dr. Rose. He also denigrated the Company and its executives in communications with Lazard executives – precisely the type of harm to have been prevented by the Separation Agreement's non-disparagement provisions. These provisions were important to the Company because a negative perception of the Company within particular circles in the business community could be seriously damaging. R. 56.1 Stmts., ¶ 188. In particular, in a December 7, 2007 response to an e-mail from Robert Berger, a Director at Lazard, to Drapkin and a number of other Lazard executives, Drapkin referred to Perelman's position with respect to a special purpose acquisition company as "ridiculous." *Id.*, ¶ 189.

---

assigns, family members of the aforementioned people and any other person with whom you have come in contact solely as a result of your employment with the Company.

Drapkin also implied to Perelman himself that Drapkin was disparaging the Company in the halls of Lazard when the two men had drinks in December 2008.  R. 56.1 Stmts., ¶ 190.  Drapkin told Perelman that Lazard had no interest in working with the Company and that the Company was not on Lazard's "radar screen."  *Id*., ¶ 191.  Given the shared history of the two men and the fact that, prior to Drapkin having gone to work at Lazard, the Company and Lazard had done business, the implication of Drapkin's statement was clear.  *Id*., ¶ 192, 193.

IV.     **Drapkin Retained, Failed to Return, and Failed to Delete Documents and Information Belonging to the Company.**

  A.     **Nancy Link, Drapkin's Agent, Was Responsible For Maintaining All of Drapkin's Documents**

Drapkin's long-time executive and personal assistant is Nancy Link.  R. 56.1 Stmts., ¶ 205.  Link has long assisted Drapkin with his personal and professional affairs and worked with his children, his grandchildren, and his wife.  *Id*.  Link was Drapkin's assistant at the Company from approximately 1987 until his departure in 2007.  *Id.*, ¶ 16.  When Drapkin left the Company in 2007 and joined Lazard, he brought Link to Lazard, where she continued as his assistant.  *Id.*, ¶ 204.

As Drapkin's assistant at the Company, Link maintained all his files.  R. 56.1 Stmts., ¶ 206.  In maintaining those files, Link did not segregate Drapkin's personal files from work-related ones.  *Id.*, ¶ 207.  When Drapkin sought to access his files, he would not retrieve them himself, but would usually request his assistant to retrieve them instead.  *Id.*, ¶ 208.

Link had access to information that was confidential to the Company, automatically received copies of all of Drapkin's emails, and was responsible for reading his emails.  R. 56.1 Stmts., ¶ 209.  For example, when an email was addressed to

Drapkin, Drapkin and Link would automatically receive the email at the same time.  *Id.* And if Drapkin deleted an email from the computer on which he accessed it, it would not be deleted from the computer on which Link accessed it.  *Id.*, ¶ 210.  Drapkin was aware that Link retained copies of his emails.  *Id.*, ¶ 211.

Link saved electronic documents to the local drive of the laptop computer on which she worked, but not on the Company's server.  R. 56.1 Stmts., ¶ 212 & Appx. Ex. 48 at No. 7 (admitting that, from January 1, 2000 through April 25, 2007, Link saved to the laptop documents related to the Company's business).  Link had been using the laptop for several years before their departure from the Company.  *Id.*, ¶ 213.  Link would backup the data on the laptop to an external drive she kept at home.  *Id.*, ¶ 214.  Drapkin was aware that Link backed up the laptop.  *Id.*, ¶ 215.  In fact, after Drapkin left the Company, when Link was not backing up the data on the laptop to the external drive, she did not want Drapkin to find out, because she knew he would worry about the information and feared that she would get in trouble for failing to back it up.  *Id.*, ¶ 216.

Link was also responsible for deleting and discarding Drapkin's data, a fact of which Drapkin was well aware.  R. 56.1 Stmts., ¶ 217.  For example, at some point in 2008, Link paid an outside company to shred a number of hard copy documents based on her conclusion that Drapkin no longer needed the documents.  *Id.*, ¶ 218.  She paid for the shredding in cash and received reimbursement from Drapkin after she informed him that the documents had been shredded.  *Id.*, ¶ 219.  Indeed, shredding documents appears to be one of Link's regular tasks in her work for Drapkin.  *Id.*, ¶ 220.

### B.   Drapkin's Obligations under the Separation Agreement Regarding the Return and Deletion of Documents.

Upon his departure from the Company at the end of April 2007, and pursuant to the Separation Agreement, Drapkin was required

> to deliver promptly to the Company at any time the Company may so request all memoranda, notes, records, reports, manuals, drawings, blueprints and other documents (and all copies thereof), including data stored in computer memories or on other media used for electronic storage and retrieval, relating to the Company's business or the business of its affiliates and all property associated therewith, which you may possess or have under your control.

R. 56.1 Appx. Ex. 24, § 6(a).

Also pursuant to the Separation Agreement, Drapkin was permitted to retain the laptop used by Nancy Link, among other equipment, but was required to

> promptly provide to the Company copies of all electronic files in your (or your personal assistant's) personal possession relating to the Company or its affiliates and not otherwise available to the Company, after which you delete (and do not attempt to recover) all copies of such files in your possession.

*Id.*, § 6(h) & Annex C.

A few days after Drapkin signed the Separation Agreement, but before he left the Company, Steven Fasman, Senior Vice President-Law for the Company, paid a visit to Drapkin at Drapkin's office.  R. 56.1 Stmts., ¶ 77.  At that meeting, Fasman told Drapkin that he was following up on the Separation Agreement and inquired whether Drapkin had anything to turn over to the Company.  *Id.*, ¶ 221.  By that question, Fasman was inquiring about documents and data to be returned to the Company pursuant to the Separation Agreement.  *Id.*, ¶ 222.  Drapkin responded that he had taken care of it and there was nothing to return to the Company.  *Id.*, ¶ 223.  Notwithstanding Drapkin's

representation to Fasman, Drapkin did not comply with his obligations to return, delete and not retain documents.

### C.    Drapkin's Instructions to Link Regarding the Return and Deletion of Documents and Her Efforts to Comply Were Patently Insufficient

Drapkin first told Link that they would be leaving to join Lazard only a couple of days prior to their departure from the Company.  R. 56.1 Stmts., ¶ 225.  At four o'clock in the afternoon on April 30, 2007 (Drapkin's last day with the Company), Link learned that they were, indeed, "really going," and hastily began to pack up Drapkin's office.  *Id.*, ¶ 226.  Drapkin also instructed Link to "get rid of any documents we do not need."  *Id.*, ¶ 227.   Link understood that Drapkin was instructing her to take documents "off the computer and delete them."  *Id.*, ¶ 228.  Accordingly, Link went through the emails saved on the laptop and deleted "[a]nything that wasn't personal."  *Id.*, ¶ 230.  She also deleted "a few" word processing files, but "was doing it very quickly because [she] was leaving quickly."  *Id.*, ¶ 231.   Before leaving, Drapkin himself left behind in his office his desktop computer, although not all of the documents on the laptop used by Link were also on Drapkin's desktop computer, because Drapkin would often delete emails and documents from that computer that Link would not delete from her laptop.  *Id.,* ¶ 232 & Appx. Ex. 48 at No. 39.

When Drapkin and Link left the Company, they retained the laptop computer on which Link worked and the external hard drive on which she had backed up the data from the laptop.  R. 56.1 Stmts., ¶ 233.  Drapkin never followed up on his instruction to Link to "get rid" of documents and thus did not ensure that Link had actually deleted the documents that Drapkin was contractually prohibited from retaining.  *Id.,* ¶ 234 .  Link now claims not to recall whether, after she and Drapkin left the Company, she ever

attempted to finish the process of going through documents on the laptop to determine whether there was anything else to delete. *Id.*, ¶ 235.

Link never attempted to delete any document or data retained on the external hard drive with which she backed up the laptop. R. 56.1 Stmts., ¶ 236. She continued to use the external hard drive and the laptop computer after she and Drapkin left the Company. *Id.*, ¶ 237. In fact, she used that external hard drive as recently as January 24, 2009. *Id.*, ¶ 238. Other devices for the storage of electronic files were attached to the laptop after Drapkin and Link left the Company, including in May and July 2007. *Id.*, ¶ 239 (referring to device "Kingston Prod DataTraveler," used May 2, 2007, and device "WD80" used July 8, 2007).

Although the Company was never able to review the contents of the external drive used to backup the laptop computer (because Link claims to have discarded it), a review of the laptop itself, conducted after this litigation began, revealed that it contained thousands of documents, including emails, dating from 1999 to April 2007. R. 56.1 Stmts., ¶¶ 240, 244. Many of those retained documents relate to Company business or the business of its affiliates.[6] *Id.*, ¶ 245. For example, Drapkin retained and failed to return the following confidential documents, among many others (a fuller, but by no means comprehensive, sampling may be found at R. 56.1 Ex. 75):

- Document regarding proposed transaction with Best Buy;

- Document summarizing proposed terms of potential merger for SIGA Technologies;

---

[6] Drapkin admits those files contain documents related to the Company's business. R. 56.1 Appx. Ex. 48, Nos. 4 & 19. It is plain from a mere sampling of the documents that they relate to the business of the Company or its present or former affiliates. *Id.*, ¶ 245. There is also no dispute with respect to the status of many of the entities referenced in those documents as affiliates of the Company. *Id.*

- Proposing potential terms of intended stick purchase and forwarding privileged and confidential draft term sheet;

- Document summarizing the proposed terms for various Licensed Products agreements between Pfizer and TransTech Pharma; and

- Document forwarding confidential analyses of potential acquisition targets.

Notwithstanding this significant volume of documents, Drapkin never returned a single document from Link's computer or her external backup device. R. 56.1 Stmts., ¶ 248. Moreover the very existence of documents on Link's laptop in well-organized files suggests either that she never seriously undertook to delete them or, even worse, did so but then retrieved them after she and Drapkin left (which would be an independent breach). *Id.*, ¶ 247.

## V.      Drapkin Improperly Sought Health Insurance Benefits.

In addition to the material terms to which the Company insisted Drapkin agree, the Separation Agreement also provides that:

> Until you reach the age of 65, the Company will reimburse you for any medical expenses (defined as those expenses covered by the executive medical reimbursement program then in effect for the Company, from time to time) incurred by you and your immediate family which are not otherwise reimbursed through medical plans, if any, covering you or your immediate family. Reimbursement of medical expenses will be based upon presentation of medical bills or such other supporting information as the Company customarily may require of its executive officers.

R. 56.1 Appx. Ex. 24, § 3(b).

This provision was included in response to Drapkin's request that the Company make up any difference between the health insurance benefits he had been receiving during his tenure at the Company and those he would receive from his new employer, Lazard. R. 56.1 Stmts., ¶¶ 253, 254. The Company attempted to satisfy that request by continuing Drapkin on the Company's "executive medical reimbursement program" (the

"GEM Plan"), which was designed to reimburse senior Company executives for medical-related expenses not otherwise covered by its basic medical plan (the "CIGNA Plan"). *Id.*, ¶ 255.

As a result of that agreement, the Company made arrangements in the days following Drapkin's departure to terminate his and his dependents' benefits under the CIGNA Plan, including by sending Drapkin a COBRA notice. R. 56.1 Stmts., ¶ 256. However, some time after his departure, Drapkin called Michael Borofsky, a Company lawyer, to report that a prescription for his wife could not be filled because he was no longer covered under the CIGNA Plan. *Id.*, ¶ 257.

Drapkin also represented to the Company that he was not covered under any plan with his new employer, which the Company understood to mean that he did not have access to such coverage. R. 56.1 Stmts., ¶ 258. In fact, unknown to the Company at the time, Drapkin did have coverage available to him but declined to participate in Lazard's plan, choosing instead to seek benefits from the Company's CIGNA Plan in addition to those under the Company's GEM Plan. *Id.*, ¶ 259.

Borofsky reported Drapkin's call to Barry Schwartz, a senior executive at the Company. R. 56.1 Stmts., ¶ 55. In response to Drapkin's call to Borofsky, and based on Drapkin's representation that he did not have coverage otherwise, the Company reinstated Drapkin to the CIGNA Plan in May 2007. *Id.*, ¶ 260. From May 2007 until November 2008, Drapkin and his dependents were insured under the CIGNA Plan and made full use of that plan. *Id.*, ¶ 261.

In November 2008, however, in the course of preparations for the re-negotiation of plan premiums with CIGNA, the Company learned that Drapkin's use of the medical

plans was unusually high and that a claim had been submitted on behalf of his adult daughter, who was not entitled to coverage under the plan. R. 56.1 Stmts., ¶ 262. As a result, Fasman called Drapkin and requested documentation concerning the health plans available from Lazard to cover Drapkin and his dependents. *Id*., ¶ 263. The documents showed that Drapkin was in fact entitled to obtain health insurance coverage through Lazard. *Id*., ¶ 264. Fasman then told Drapkin that he had acted improperly in seeking coverage under the Company's CIGNA Plan, that he would be terminated from that plan on December 31, 2008, and that he should arrange to become a member of another healthcare plan so that he would not experience a lapse in coverage. *Id*., ¶ 66, 268.

During these discussions, Fasman conveyed to Drapkin the Company's belief that Drapkin was taking advantage of the Company by his actions. R. 56.1 Stmts., ¶ 66. Fasman referred to Drapkin's improper use of the CIGNA Plan when he told Drapkin that the Company believed he had been behaving inconsistently with his obligations under the Separation Agreement. *Id*., ¶ 265. Notably, in response to those statements, Drapkin did not deny that he was failing to comply with his obligations or otherwise try to justify his conduct, but rather blamed his actions on Perelman. *Id*., ¶ 266. In fact, Drapkin claimed that his behavior was "responsive" to some unspecified supposed wrong done to him by Perelman. *Id*., ¶ 267 (Drapkin "said that Ronald was tweaking him or uts'ing him or some word like that and his actions were responsive.").

## **ARGUMENT**

I. **Legal Standard.**

Summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to

any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" for these purposes when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* It is the movant's burden to demonstrate that no genuine issue of material fact exists. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970).

A court considering a summary judgment motion must construe the evidence favorably to the nonmoving party, drawing all inferences in that party's favor. *Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 175 (2d Cir. 2003). If there is "any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party," then summary judgment should be denied. *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d. Cir. 1994).

Additionally, "assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir. 1996); *see also Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses.").

### A.    The Issue of Materiality is a Fact Issue for the Jury.

In breach of contract cases governed by New York law, "the question of materiality of breach is a mixed question of fact and law—usually more of the former and less of the latter—and thus is not properly disposed of by summary judgment."[7] *Bear*

---

[7] Though Drapkin's brief cites two cases in which courts held without analysis that the materiality of a breach is a question of law, neither of those cases addressed the issue of materiality at the summary

*Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, 361 F. Supp. 2d 283, 295-96 (S.D.N.Y. 2005) (citing *Dopp v. Pritzker*, 38 F.3d 1239, 1244 (1st Cir. 1994) ("[C]ourts and commentators have long recognized that materiality is primarily a question of fact, the resolution of which is necessarily a function of context and circumstances."); 2 E. Allan Farnsworth, *Farnsworth on Contracts*,  § 8.16, at 443 (1990)  ("Whether a breach is material is a question of fact.")); *see also Teachers Ins. and Annuity Ass'n of America v. Coaxial Commc'ns of Cent. Ohio, Inc.*, 807 F. Supp. 1155, 1160 (S.D.N.Y. 1992) ("It is for the jury to determine materiality with respect to any alleged breach."); *Case Boring Corp. v. Venditti Constructors, Inc.*, 360 N.Y.S. 2d 750, 752 (4th Dep't 1974) ("How material any breach on the part of either party was, or any possible waiver of the breach, further raised issues of fact.").

**B.      Summary Judgment Is Inappropriate Where Contractual Terms Are Ambiguous.**

"When the meaning of [a] contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment."  *LaSalle Bank N.A. v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005) (quotation marks omitted); *see also Long Island Airports Limousine Serv. Corp. v. Playboy-Elsinore Assocs.,* 739 F.2d 101, 103 (2d Cir. 1984) ("where a contract is not wholly unambiguous, summary judgment must be denied" (quoting  *Schering Corp. v. Home Insurance Co.,* 712 F.2d 4, 10 (2d Cir. 1983))) "Where contract language is susceptible of different meanings, the nonmovant on a summary judgment motion must be given an opportunity to present extrinsic evidence to

---

judgment stage.  Indeed, in one, *Wechsler v. Hunt Health Sys., Ltd.*, the court declined "to consider the issue at the summary judgment stage until the relevant facts and legal arguments were developed 'either at trial or on a renewed motion for summary judgment.'"  186 F. Supp. 2d 402, 413 (S.D.N.Y. 2002).

establish what was intended by the written words." *Eye Assoc., P.C. v. IncomRX Sys., L.P.*, 912 F.2d 23, 28 (2d Cir. 1990) (citations omitted).

## II.      There Are Triable Issues of Material Fact Regarding Whether Drapkin Materially Breached Section 6(c) of the Separation Agreement.

### A.      Drapkin Materially Breached Section 6(c).

As set forth above, Dr. Rose testified that he and Drapkin had a conversation on May 14, 2007 in which Drapkin told him "that as a career opportunity for me that this was going to be disastrous" and that the Company had no interest in the life sciences – Rose's area of expertise.  R. 56.1 Stmts., ¶ 153.  These statements by Drapkin to Rose constitute a clear violation of Section 6(c) of the Separation Agreement, which prohibited Drapkin from "attempt[ing] to influence any employee of the Company or its affiliates … to terminate his or her employment with the Company."  R. 56.1 Appx. Ex. 24, § 6(c).

Drapkin apparently contends that Dr. Rose is lying about the conversation that took place during the Quality Meats Dinner.  R. 56.1 Stmts., ¶ 196.  Drapkin even speculates that Dr. Rose is offering false testimony for fear of losing his job.  *Id*.  Of course, a jury could reasonably conclude that Dr. Rose (a world class heart surgeon who has no stake in the outcome of this litigation) is telling the truth, and Drapkin (whose career has floundered and has millions of dollars riding on this conversation) is the one who is lying.  Resolution of this conflicting evidence requires assessments of credibility and a choice between conflicting versions of events.  It cannot be resolved on summary judgment.  *See, e.g.*, *Rule,* 85 F.3d at 1011; *Hayes,* 84 F.3d at 619.

Further, while the materiality of Drapkin's breach of Section 6(c) remains an issue for the fact-finder, *see Bear Stearns*, 361 F. Supp. 2d at 295-96, there is already

sufficient evidence for a reasonable jury to find that Drapkin's efforts to induce Dr. Rose to leave the Company amounted to a material breach of Section 6(c).

Drapkin's statements to Dr. Rose posed serious harm to the Company. Dr. Rose is not a low-level Company employee whom the Company could lose without being affected. Rather, he is one of a handful of senior executives who form the leadership of the Company. R. 56.1 Stmts., ¶ 183. As noted above, Dr. Rose is an extremely well-regarded figure in the field of medicine and health science, and as the former Chairman of the Department of Surgery and Surgeon-in-Chief of the Columbia Presbyterian Hospital Center of New York, his position with the Company provides a tremendous resource in the Company's efforts to expand into the life sciences field. *Id*., ¶ 177. Indeed, his loss would be very damaging to the Company's business. *Id.*, ¶ 183.

In addition, Drapkin knew his comments would carry particular weight with Dr. Rose because they had been friends for many years and Drapkin himself had played a role in recruiting Dr. Rose to the Company only months earlier. R. 56.1 Stmts., ¶ 184. Indeed, Drapkin's comments had a significant impact, as Dr. Rose testified to being "personally frightened" that he had made a serious career mistake. *Id*., ¶ 155.

Though Drapkin contends that his comments constituted "friendly advice and stale venting" ("Drapkin Mem.," p. 28), this is belied by the importance of Dr. Rose to the Company, the amount of influence Drapkin wielded over Dr. Rose, and Dr. Rose's actual reaction to Drapkin's comments. It is difficult to conceive of a plainer violation of Section 6(c) than the comments made to Dr. Rose on May 14, 2007.

**B.      The Issue of Drapkin's Material Breach of Section 6(c) Is Part of This Case.**

Apparently recognizing that his violation of Section 6(c) is a classic example of a factual dispute that requires this case to go to trial, Drapkin chooses in his motion for summary judgment to ignore this issue altogether and pretend that the question of whether Drapkin breached Section 6(c) is not part of the case.   In so doing, Drapkin simply ignores the fact that, for many months now, he has been on notice that the Company contends he breached 6(c) as a result of this conversation with Dr. Rose.

In a May 14, 2010 letter to the Court requesting a pre-motion conference on his motion for summary judgment, Drapkin for the first time argued that Dr. Rose's testimony about Drapkin's statements to him should be precluded because he was not listed as a witness in the Company's initial disclosures.   R. 56.1 Stmts., ¶ 199.   In response, the Company pointed out that, regardless of whether Dr. Rose was listed in the initial disclosures, his role in the case was made plain by (among other things): (1) Fasman's 30(b)(6) deposition testimony, which explained the Company's contention that Drapkin breached the Separation Agreement in conversations with Dr. Rose [8]; and (2) Dr. Rose's submission of an affidavit outlining the relevant evidence to which he would testify in support of the Company's opposition to Drapkin's motion to quash certain subpoenas.   R. 56.1 Stmts., ¶ 200.[9]   Based on the parties' correspondence to the Court

---

[8]      In fact, Fasman explicitly testified at this deposition that the Company contended that Drapkin's statements to Dr. Rose violated Section 6(c) of the Separation Agreement.   R. 56.1 Stmts., ¶ 198  ("A: The conversations that Mr. Drapkin had with Dr. Rose at the Quality Meats dinner violated the Separation Agreement, that is a contention of MacAndrews & Forbes. Q: Which provision of the Separation Agreement? A: All of it, but I would principally focus on paragraph 5 *and paragraph 6c*.") (emphasis added).

[9]      Though Dr. Rose was not included in the Company's initial disclosures as a potential witness, Rule 26(e) only requires amendment of a party's initial disclosures "if the additional or corrective information *has not otherwise been made known to the other parties during the discovery process* or in

and the pre-motion conference, the Court ordered that Drapkin be allowed to depose Dr. Rose on the issues in the case as to which he possessed relevant evidence.  R. 56.1 Stmts., ¶ 201.

Dr. Rose's deposition occurred on June 11, 2010, and he spoke in detail about the conversation at issue.  R. 56.1 Stmts., ¶ 197.  Drapkin's counsel's questions plainly indicated an understanding that the Company was offering Dr. Rose's testimony to support its claim that Drapkin breached Section 6(c).  R. 56.1 Stmts, ¶ 202 ("Anything else that he said that you recall in terms of the basis for his advising you that remaining employed by MacAndrews is not a good long-term move for you?").

Now, however, Drapkin ignores the Company's contention that he violated Section 6(c).  It appears that Drapkin's sole response to Dr. Rose's testimony on this issue will be that the Company's claim under Section 6(c) is somehow unavailable as outside of the pleadings.  Such an argument, however, is specious at best.

The Court ruled in January 2010, in the context of a discovery dispute, that the issues relating to disparagement were properly part of the case because the Company's allegation of "breach of contract" was sufficient to raise the issue.  R. 56.1 Stmts., ¶ 195. And, in any event, the Company has now specifically raised the Section 6(c) breach in its Answer and Affirmative Defenses, filed July 27, 2010, to Drapkin's Third Amended Counterclaim.  *Id.*, ¶ 203.

---

writing." (Emphasis added).  As detailed in the Company's May 18, 2010 letter to the Court,   Drapkin plainly was aware of both Dr. Rose's testimony and the Company's intent to rely on it at trial.  In such a case, the preclusion of testimony is not appropriate.  *See, e.g., Highland Capital Mgmt., L.P. v. Schneider,* 551 F. Supp. 2d 173, 202 (S.D.N.Y. 2008) (rejecting the "drastic remedy" of evidence preclusion where party seeking preclusion was aware of witness' existence despite absence from initial disclosures and lack of subsequent amendment).

Thus, it is wrong as a matter of both fact and law to argue that Section 6(c) is outside the pleadings.  Moreover, Drapkin suffers no harm from this result, as he has been on notice of the Company's claim that he violated Section 6(c) since at least either Dr. Rose's January 4, 2010 declaration or Fasman's deposition on February 4, 2010, and he has deposed Dr. Rose in detail about the evidence that relates to the Company's claim. R. 56.1 Stmts., ¶¶ 194, 198, 202.  Given the circumstances, Drapkin may not bar this aspect of the case and is not able to obtain summary judgment on the issue by claiming that the Company cannot raise it.  *See, e.g.*, *St. Paul Fire & Marine Ins. Co. v. Heath Fielding Ins. Broking Ltd.*, 91 Civ. 0748(MJL), 1996 WL19028, at *6 (S.D.N.Y. Jan. 17, 1996) ("because the Federal Rules of Civil Procedure aim to facilitate the decision of cases on their merits, courts generally allow amendments to permit the presentation of the 'real issues of the case.'") (citing 3 James W. Moore *et al., Moore's Federal Practice*, ¶ 15.08[2] at 15-48-49 and cases cited therein (2d ed. 1995)).

**III.      Drapkin Breached Section 5 of the Separation Agreement**.

Drapkin seeks summary judgment that he did not breach Section 5's prohibition against disparaging the Company and "Related Persons."  Drapkin Mem., pp. 24-28.  In making his argument, however, Drapkin invites the Court to ignore a host of genuine issues of material fact and to adopt a dubious construction of the contractual language.

Dr. Rose testified that, at the same May 14, 2007 conversation in which Drapkin tried to induce him to leave the Company, Drapkin also made a number of negative comments about Ronald Perelman. R 56.1 Stmts., ¶ 186.  And, as with Dr. Rose's testimony about Drapkin's breach of Section 6(c), Drapkin contends that he is lying.  *Id.*, ¶ 196.

Drapkin also claims that the Company has no evidence of disparagement other than his comments to Dr. Rose.  This is wrong.  Indeed, Dr. Rose has provided evidence that he witnessed Drapkin making denigrating statements about Perelman to their mutual acquaintances at other times subsequent to Drapkin's departure.  R 56.1 Stmts., ¶ 187 & Appx. Ex. 37, ¶ 6.

Further, Perelman testified that, prior to Drapkin's employment with Lazard, Lazard was a willing business partner of the Company, but the relationship cooled significantly once Drapkin went to work there.  R 56.1 Stmts., ¶ 192.  Coupled with Drapkin's comments to Perelman in December 2008 that Lazard had no interest in working with the Company and that the Company was not on Lazard's "radar screen," a jury could conclude that Drapkin was disparaging the Company and Perelman to Lazard executives.  *Id.*, ¶¶ 190-191.  Such a conclusion would be bolstered by an email produced by Lazard in which Drapkin described to other Lazard executives a business venture of Perelman's, or Perelman himself, as "ridiculous."  *Id.*, ¶ 189.

Notwithstanding the obvious credibility dispute between Dr. Rose and Drapkin, and the additional evidence of disparagement not addressed by Drapkin in his brief, Drapkin argues he should be entitled to summary judgment on this issue for two reasons.  First, he claims that his comments cannot constitute a breach of Section 5 because the Company never gave him notice and an opportunity to cure.  On this point, he is wrong as a matter of law.  It is well-settled that "adherence to the cure provision of a contract is not required where it would be a futile act."  *Sea Tow Servs. Intern., Inc. v. Pontin*, 607 F. Supp. 2d 378, 389 (E.D.N.Y. 2009) (citation omitted); *see also Point Prods. A.G. v. Sony Music Entm't Inc,* No. 93 Civ. 4001(NRB),  2000 WL 1006236, at *3 (S.D.N.Y. July 20,

2000) ("[p]roviding notice and cure is not required where it would be futile"); *Hicksville Mach. Works Corp. v. Eagle Precision, Inc.,* 635 N.Y.S.2d 300, 302 (2d Dep't. 1995) (not required to provide opportunity to cure where cure was impossible).  Here, if Drapkin has disparaged the Company or Related Persons, such breach is not curable as the damage to the reputation of the Company and its Related Persons is done.  That bell cannot be unrung.

Second, Drapkin contends that the Company cannot make a claim of disparagement because none of his comments to Dr. Rose entered, or were reasonably likely to enter, the "public domain."  Drapkin Mem., p. 26.  Drapkin posits, based on several cases completely outside the disparagement context, that the term "public domain" is synonymous with "dissemination to the public."  *Id.*, p. 27.  The Company contends, however, that the parties understood the term to encompass "the community in which MacAndrews & Forbes travels" including "the deal makers, the businesspeople, the lawyers, [and] the financiers."  R 56.1 Stmts., ¶ 185.  And indeed, in the context of *this* non-disparagement clause, that meaning must be the correct one.

The success of the Company's business is highly dependent on the reputation of the Company and its executives within the relatively small business community in which it operates.  R 56.1 Stmts., ¶ 193.  If, as Drapkin contends, the only protection the Company was afforded by Section 5 was against publication in the broader media, then the provision would be rendered a nullity since Drapkin would be free to bad-mouth the Company and its Related Persons to those with whom the Company actually does business.  Such a result would violate basic rules of contract interpretation.  *See, e.g.*, *deBrossard v. Van Norden,* 495 N.Y.S.2d 369, 372 (1st Dep't.1985) ("The rules of

construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract, or in the negative, no provision of a contract should be left without force and effect." (quoting *Muzak Corp. v. Hotel Taft Corp.,*133 N.E.2d. 688 (N.Y. 1956))).

But, in any event, the meaning of "public domain" in this context is, at the very least, susceptible to different meanings.  As a result, because resolution of its meaning requires interpretation of extrinsic evidence of the parties' intent, summary judgment on the issue is not appropriate.  *See, e.g.*, *Long Island Airports,* 739 F.2d at 103.

Because a reasonable jury could find, on this evidence, that Drapkin violated Section 5, his motion for summary judgment should be denied.

## IV.       Drapkin Breached Section 6(a) of the Separation Agreement.

In Section 6(a) of the Separation Agreement, Drapkin agreed to promptly deliver to the Company, at any time the Company may so request, all documents relating to the Company's business or its affiliates, in his possession or under his control, including data stored in computer memories or on other media used for electronic storage and retrieval. R 56.1 Appx Ex. 24, § 6(a).  Drapkin suggests he is entitled to summary judgment that he did not violate that provision for two reasons.  First, he contends that the scope of the provision does not include documents and data retained on the laptop computer used by his assistant, Nancy Link.  *See* Drapkin Mem., p. 14.  Second, he claims that he was never required to return anything to the Company because the Company never effectively asked him to do so.  *See id.*  Drapkin is wrong about the contract and about the evidence.

### A.       Section 6(a) Required Drapkin to Return Documents in His Possession or Under His Control.

Drapkin claims that Section 6(a) does not reach anything in the possession of Link because that provision does not expressly refer to documents in her personal possession, whereas Section 6(h) references documents in Drapkin's "or [his] personal assistant's" personal possession. *See* Drapkin Mem., p. 15. This argument fails for two reasons.

First, Drapkin fails to point out that, unlike Section 6(h), Section 6(a) is not limited to documents and data in Drapkin's (or his assistant's) ***personal possession***, but instead refers to documents and data which Drapkin "may possess ***or have under [his] control.***" *Compare* R 56.1 Appx Ex. 24, § 6(a) *with* § 6(h) (emphases added).

Drapkin makes no attempt to address the question of his ***control*** over the documents on the laptop and external drive used by Link. *See* Drapkin Mem., pp. 14-16. His argument that they were not in his possession is therefore of no moment.

Further, by arguing that Section 6(a) applies only to documents and data in Drapkin's possession—to the exclusion of files maintained by his assistant—Drapkin urges an interpretation which would render that provision meaningless. As discussed above, Link maintained ***all*** Drapkin's files at the Company. R 56.1 Stmts., ¶ 206. And when the Company and Drapkin entered into the Separation Agreement, it was known that Link would be accompanying Drapkin to Lazard. R 56.1 Stmts., ¶ 204 & Appx. Ex. 24, § 6(c). To read the provision as permitting Link to retain, without limitation, information from the files she maintained would be to effectively read the provision out of the contract. *See Shaw Grp., Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121, 124 (2d Cir. 2003) (contract should be construed to give effect to all provisions and interpretation rendering clause superfluous will be avoided if possible).

Further, these files were in fact at all times under Drapkin's control.   In the context of a party's obligation to produce documents under its "possession, custody or control," courts have construed "control" as the legal right, authority, or practical ability to obtain them on demand.   *See United States v. Stein*, 488 F. Supp. 2d 350, 361 n.45 (S.D.N.Y. 2007) (collecting cases).   There can be no serious dispute concerning Drapkin's authority and practical ability to obtain files from Link which she maintained on his behalf.   Link maintained all Drapkin's personal and business records and retrieved files for him whenever he requested.   R 56.1 Stmts., ¶¶ 206, 208.

Second, and in any event, as a matter of agency law, documents in the possession of his agent are deemed possessed by Drapkin and under his control.   *See, e.g.*, *Bryan v. Bartlett*, 435 F.2d 28, 33 (8th Cir. 1970) ("it is an elementary principle of agency that delivery to a principal's agent is the equivalent of delivery to the principal."); *Bronson v. Kelchner*, No. 07-1191(ARH), 2008 WL 5397759, at *7 (W.D. Pa. Dec. 23, 2008) ("the clear rule is that delivery to an agent constitutes delivery to the principal") (collecting cases) (citations omitted); *Premier Bank v. Cohen-Esry Props., Inc.*, 859 F. Supp. 1388, 1396 (D. Kan. 1994) ("Delivery to one's agent constitutes delivery to the principal, and likewise possession by one's agent constitutes possession of the principal.") (citation omitted).[10]

Because Drapkin had control over them, whether or not he possessed them, and because Nancy Link is Drapkin's agent, Section 6(a) plainly covers documents and data

---

[10] That Link was at all times Drapkin's agent is beyond dispute.   "Agency is the relationship that results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."   *G.D. Searle & Co. v. Medicore Commc'ns., Inc.*, 843 F. Supp. 895, 904 (S.D.N.Y. 1994).   For twenty years, Link worked exclusively as Drapkin's secretary and personal assistant.   R. 56.1 Stmts., ¶ 16.   "[W]hen facts relied upon to establish the existence of an agency are undisputed, and conflicting inferences cannot be drawn therefrom, the question of the existence of the agency is one of law and should be determined by the court."   *G.D. Searle & Co.*, 843 F. Supp. at 905.

both on the laptop computer used by Link and on the external devices she used to back up that data.  In short, that the retained documents were physically carried away from the Company (and not returned) in the hands of Link, and not by Drapkin, is not a defense to the Company's Section 6(a) claim.[11]

> **B.       The Company Requested the Return of Documents.**

Drapkin further seeks summary judgment that he was never required to return anything under Section 6(a) because the Company never asked him to return the materials.  *See* Drapkin Mem., pp. 14-15.  The evidence, however, indicates a genuine dispute about that fact.

Fasman's testimony is that he met with Drapkin in Drapkin's office during the last week of April 2007 and inquired whether Drapkin had anything to turn over to the Company.  Fasman specifically told Drapkin that he was following up on the Separation Agreement.  R. 56.1. Stmts., ¶ 221.  By that question, Fasman was inquiring about documents and data to be returned to the Company pursuant to the Separation Agreement.  *Id.*, ¶ 222.  Fasman recalls that Drapkin said in response that he had taken care of it and there was nothing to return to the Company.  *Id.*, ¶ 223.

Further, just as Drapkin and Link were about to leave the Company on the afternoon of April 30, 2007, Drapkin hastily instructed Link to "get rid of any documents we do not need."  R. 56.1. Stmts., ¶ 227.  She understood that Drapkin was telling her to take documents "off the computer and delete them."  *Id.*, ¶ 228.  Accordingly, Link went through the emails on the laptop and deleted "[a]nything that wasn't personal" and deleted "a few" word processing files, but "was doing it very quickly because [she] was

---

[11]At a bare minimum, there is a factual dispute regarding whether Drapkin controlled documents in Link's possession that would preclude summary judgment.

leaving quickly." *Id.*, ¶¶ 230, 231.   Before leaving, Drapkin himself left behind his desktop computer, "with everything [he] had with respect to the company." *Id.*, ¶ 232. That Drapkin instructed Link in this fashion and then returned his own computer is corroborative of Fasman's testimony that he requested that Drapkin comply with the Separation Agreement's provision requiring the return and deletion of documents.

Drapkin claims there was no such conversation with Fasman and that Fasman's "memory's faulty." R. 56.1. Stmts., ¶ 224.  As for Drapkin's instructions to Link about getting rid of documents, Drapkin's testimony is that he doesn't think he "had anything crisp and clear in [his] mind when [he] said it," but that he "certainly wanted [Link] to save [his] personal emails" and "get rid of things that related to MacAndrews & Forbes that [he] didn't need or want or care about." *Id.*, ¶ 229.

Of course, if it was merely a matter of unburdening himself and Link of unwanted files, why would Link need to rush to delete files before they left?  The Court need not, and we respectfully submit, should not, resolve that question here. The bottom line for purposes of this motion is that the evidence is in conflict with Drapkin's self-serving testimony on the question of whether the meeting between Fasman and Drapkin occurred, and, if so, what was said at that meeting.  Certainly, a reasonable jury could find that Fasman conveyed to Drapkin that he could not take the documents.   Under the circumstances, summary judgment is not appropriate. *See, e.g., Rule,* 85 F.3d at 1011 ("assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment").

**V.          Drapkin Breached Section 6(h) of the Separation Agreement.**

Section 6(h) of the Separation Agreement required Drapkin to promptly provide to the Company copies of electronic files in Drapkin's or his assistant's possession

relating to the Company or its affiliates that were not otherwise available to the Company, and to delete and not attempt to recover any electronic files in Drapkin's or his assistant's possession relating to the Company or its affiliates.  R. 56.1. Appx. Ex. 24, § 6(h).

Drapkin suggests he is entitled to summary judgment on this provision for two reasons.  First, he contends that, "except for a handful of documents," the documents found on Link's laptop were not present on that laptop when Drapkin left the Company (which is somehow purportedly dispositive).  *See* Drapkin Mem., pp. 16-17.  Second, he claims that all of the electronic files were otherwise available to the Company.  *See id.* However, neither of those contentions is true, and neither, even if true, would entitle Drapkin to summary judgment on the Company's Section 6(h) claim.

### A.    Section 6(h) Applies to Files on the External Drive Retained By Link.

Drapkin is wrong to claim that the "only electronic documents at issue [under 6(h)] are those that were located on Link's laptop" and that the Company can offer "no evidence suggesting that the documents produced from the Link laptop were in Link's (much less Drapkin's) personal possession at the time she and Drapkin left the Company."  Drapkin Mem., pp. 16, 20.

First, Section 6(h), by its terms, refers to "all electronic files in [Drapkin's] (or [Drapkin's] personal assistant's) personal possession.  R. 56.1 Appx. Ex. 24, § 6(h).  This is not limited to data on the laptop used by Link, but includes data on the external drive with which she backed up the laptop, or on any device in her or Drapkin's possession capable of storing electronic files.

Second, the ***undisputed*** evidence is that the external drive contained electronic files relating to the Company and its affiliates and was in Link's possession at the time

she and Drapkin left the Company.  R. 56.1 Stmts., ¶¶ 237, 245.  Link used the laptop for several years and backed up the laptop before she and Drapkin left the Company.  R. 56.1. Stmts., ¶¶ 103, 232.  Her testimony on that point is consistent with findings from the forensic examinations of the laptop.  *Id., ¶* 238.  Link ***admits*** that she never attempted to remove any electronic files from the device and certainly had it in her possession when she and Drapkin left the Company.  *Id., ¶* 236.

Third, Drapkin's theory, that the thousands of electronic files found on the laptop were somehow acquired months after Drapkin left the Company, is of no help to his summary judgment motion.  Even if his expert's suggestions were true that the files were placed on the laptop in July 2007, and that the source of the files was an external drive other than the one Link retained from the Company, such suggestions raise more questions than they resolve.  *See* Drapkin Mem., pp. 20-21.  For example, how did files dating from years before wind up being loaded onto the laptop in July 2007?  Who loaded them? In whose possession were they between April and July 2007?  It is clear from these questions, and the facts that currently exist, that a reasonable jury could easily conclude that the Company documents that Link and Drapkin had in July 2007 were also in their possession in April 2007, especially where neither Drapkin nor Link could say when or where they acquired that information.

**B.    Section 6(h) Required Drapkin to Delete (and Not Attempt to Recover) All Electronic Company Files in His or Nancy Link's Possession.**

Drapkin argues that he is entitled to summary judgment on the Company's Section 6(h) claim because no obligation arose to provide copies of electronic files, as they were supposedly otherwise available to the Company.  *See* Drapkin Mem., pp. 17-

20.   But the obligation to provide the Company with copies of files not otherwise available to the Company is only one part of Section 6(h).

Contrary to Drapkin's apparent interpretation, Section 6(h) affirmatively obligated Drapkin to delete (and not attempt to recover) all electronic files relating to the Company or its affiliates in his or in Link's possession, ***whether or not any are otherwise available to the Company***.  The purpose of the provision is obviously to prevent access to Company files by people outside the Company, including departing employees.  That the Company seeks copies of files that do not exist elsewhere within the Company, if any, serves a separate and subsidiary purpose:  that in implementing the primary purpose the Company does not permanently lose access to any Company files.

The alternate construction is that Section 6(h) requires Drapkin only to delete electronic files that the Company does not otherwise have, after supplying it with copies.  Such interpretation would render the provision nonsensical – why would the Company only insist on deletion of documents it does ***not*** have? – and would be ineffectual at protecting Company files from dissemination outside the Company.

The only reasonable meaning of Section 6(h) is that it required Drapkin to delete all electronic files relating to the Company or its affiliates in his or in Link's possession, without regard to whether they were not otherwise available to the Company.[12]  Accordingly, whether and which electronic files may or may not have been available to the Company from other sources is not a defense to the Company's claim under Section 6(h), where it is undisputed that Drapkin did not delete any of them.

---

[12]     Further, as set forth in the accompany declaration of Timothy S. Martin – which explains that many of the documents recovered from the Link laptop are not anywhere to be found on the Company's computer systems – Drapkin's contention that there is no evidence that the documents at issue were not otherwise available to the Company is simply untrue.  R. 56.1 Stmts., ¶ 246.

### C. Drapkin Failed to Delete (or Attempted to Recover) Thousands of Company Documents.

The undisputed evidence is that, at the time of Drapkin's and Link's departure, Link possessed electronic files on the external hard drive which she used to backup the laptop, that she never deleted any files from the external drive, that she took it with her when she departed, and that she continued to use the external drive with the laptop after she left the Company.   R. 56.1 Stmts., ¶¶ 233, 236-238.   Plainly, and in violation of Section 6(h) of the Separation Agreement, Drapkin failed to delete electronic files in Link's possession related to the Company or its affiliates.

Further, the theory presented by Drapkin's expert that the thousands of files found on the laptop somehow arrived after Drapkin and Link left the Company, coupled with evidence that Link maintained control of the laptop throughout, suggests that Drapkin, through his agent, may have likewise violated Section 6(h) by attempting to recover electronic files relating to the Company or its affiliates.   There certainly is no dispute that a review of the laptop conducted after the litigation began revealed that it contained thousands of documents, including emails, dating from 1999 to April 2007 that relate to the Company or its affiliates.  R. 56.1. Stmts., ¶¶ 244, 245.  Moreover, the files found on the laptop were in the active space (as opposed to the deleted space) and were well-organized into various subfolders. R. 56.1 Stmts., ¶ 247.  This all suggests that no one ever attempted to delete these files, and even if they did, the evidence suggests that Drapkin improperly acted to recover them.

### VI. An Adverse Inference Should Be Drawn Against Drapkin Because Link Discarded Evidence After the Obligation to Preserve Arose.

While the Company has adduced sufficient evidence in this case to survive summary judgment on Drapkin's breaches of Sections 6(a) and 6(h) of the Separation

Agreement, Drapkin has repeatedly deprived the Company of direct evidence of the particular documents he improperly retained and failed to delete.

Initially, in opposing the Company's motion to compel direct access to the laptop used by Link, Drapkin assured the Company and the Court that his search, "using the Company's expansive search terms, identified a total of only 15 arguably Company-related documents (from the thousands of files on the machine)." R. 56.1 Stmts., ¶ 243. But, after the Court ordered that access, the Company's expert consultants located *at least 2,300* documents related to the business of the Company and its affiliates and responsive to the Company's document requests. *Id.*, ¶¶ 244, 245. As noted above, these files were not recovered from the "deleted space" or some other deep recess of the computer. Rather, they were all in the active space of the computer in well-organized subfolders. *Id.*, ¶¶ 246, 247.

Worse yet, the external hard drive with which the laptop was backed up has been purportedly discarded. R. 56.1. Stmts., 240, 241. The evidence on that device has become particularly important given the recent claims by Drapkin's expert that the documents located on the laptop, even though they date back several years, were created on or placed on the laptop in July 2007, after Drapkin left the Company. *See* Drapkin Mem., pp. 20-21.

That the evidence was intentionally discarded while under the control of Drapkin, at a time when Drapkin had an obligation to preserve it, supports an inference that the evidence would have been unfavorable to Drapkin. *See Kronisch v. United States*, 150 F.3d 112, 126-28 (2d Cir. 1998) (outlining the contours of the adverse inference rule on a motion for summary judgment).

Here, Link intentionally discarded the evidence. The chronology of events surrounding the destruction of this key evidence is troubling:

- January 5, 2009: Drapkin admits that, by this time, he was contemplating litigation, which gives rise to a duty to preserve evidence. R. 56.1 Stmts., ¶ 249 (conveying Drapkin admission). Importantly, as noted above, Drapkin knows by this time that, for years, Link has engaged in the practice of shredding documents she determines are no longer needed. *Id.*, ¶ 220.

- January 24, 2009: Link uses (and, *a fortiori,* still possesses) the device. R. 56.1 Stmts., ¶ 250 (referring to device "WD Prod 1600JS," used between September 10, 2006 and January 24, 2009).

- February 13, 2009: Drapkin files his complaint. R. 56.1. Stmts., ¶ 251.

- February 26, 2009: Counsel for the Company sends a letter to counsel for Drapkin requesting the preservation of all relevant evidence, including electronic evidence in Link's possession. R. 56.1 Stmts., ¶ 252.

- July 20, 2009: The Company learns for the first time at a meet and confer among counsel that Link claims to have discarded the device because it supposedly stopped working.

Notably, although Link now claims to have innocently discarded the device because it had supposedly stopped working, there is absolutely no corroborative evidence of this claim. She admits, for example, that nobody witnessed its supposed malfunction and that she made no effort to have it fixed. R. 56.1 Stmts., ¶ 241. Further, Drapkin's own expert admits that he is unaware of any forensic evidence indicating that, as of January 24, 2009, the back-up device had actually malfunctioned. *Id.*, ¶ 242.

Because the Company has adduced substantial evidence, largely in the form of Link's testimony and the results of the review of the laptop, that Drapkin breached Sections 6(a) and 6(h) of the Separation Agreement, along with evidence to support an adverse inference based on the destruction of the external hard drive, the Company is entitled to a trial on those claims   See *Kronisch*, 150 F.3d at 128 ("plaintiff has produced

enough circumstantial evidence to support the inference that the destroyed . . . files may have contained documents supporting (or potentially proving) his claim, and that the possibility that a jury would choose to draw such an inference, combined with plaintiff's circumstantial evidence, is enough to entitle plaintiff to a jury trial.").

**VII.      Drapkin Breached Section 3(b) of the Separation Agreement.**

Finally, there is a genuine, material fact dispute as to whether Drapkin breached Section 3(b) of the Separation Agreement, and the covenant of good faith related thereto, by seeking basic health insurance coverage from the Company when such coverage was available to him at Lazard.  Despite Drapkin's claims that the he had no such obligation, Barry Schwartz, who negotiated the provision on behalf of the Company, testified that the parties shared the clear understanding that Drapkin would obtain basic healthcare coverage from his new employer.   Drapkin Mem., p. 11 & R. 56.1 Stmts., ¶ 254. Schwartz also testified that this understanding was implicit in the language of the provision.  *Id.*  Indeed, Schwartz's recollection is consistent with the actions taken by the Company in the days after Drapkin's departure, including making arrangements to terminate the CIGNA coverage for Drapkin and his dependents and sending Drapkin a COBRA notice.  R. 56.1 Stmts., ¶ 256.

At the very least, the language of Section 3(b) is ambiguous as to whether Drapkin had an obligation to obtain coverage from Lazard and summary judgment is therefore inappropriate.  *See, e.g.*, *LaSalle Bank N.A. v. Nomura*, 424 F.3d at 205.

Drapkin's further claim that the Company's gratuitous and temporary reinstatement of the primary coverage somehow operates as a "course of dealing" with respect to Section 3(b) should also be rejected.  Drapkin Mem., pp. 12-13.  This supposed "course of dealing" arose because, based on Drapkin's representations on this issue, the

Company understood that he did not have coverage *available* to him at Lazard, not that he had elected to waive coverage.  Moreover, to the extent Drapkin argues that the Company's witnesses are not recalling that conversation correctly, this is another material fact in dispute making summary judgment inappropriate.

Further, when Fasman told Drapkin that the Company believed he was taking advantage of the Company by his actions—referring to Drapkin's improper use of the CIGNA Plan—Drapkin made no attempt to refute that allegation but instead said that Perelman had provoked him.  R. 56.1 Stmts., ¶ 266.

Finally, though Drapkin claims that his termination from the CIGNA Plan and enrollment in the Lazard plan was a "compromise," which waived the Company's rights to sue for breach (*see* Drapkin Mem., pp. 12-13), Fasman testified that he never reached *any* agreement with Drapkin on the issue but simply unilaterally told Drapkin he was being removed from the plan and should seek other coverage so that he did not experience a lapse in coverage.  R. 56.1 Stmts., ¶ 268.

Those disputed genuine issues of material fact preclude summary judgment with respect to Drapkin's breach of Section 3(b) of the Separation Agreement.

## **CONCLUSION**

For the foregoing reasons, Drapkin's motion for summary judgment should be denied.

Dated: New York, New York
      August 2, 2010

Respectfully submitted,

KOBRE & KIM LLP

_s/ Steven G. Kobre
Steven G. Kobre (steven.kobre@kobrekim.com)
Steven W. Perlstein (steven.perlstein@kobrekim.com)
Jonathan D. Cogan (jonathan.cogan@kobrekim.com)
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200

*Attorneys for MacAndrews & Forbes LLC and Mafco Consolidated Group, Inc.*