UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DONALD G. DRAPKIN,

                             Plaintiff,

      -against-

MAFCO CONSOLIDATED GROUP, INC.,

                            Defendant.

**MEMORANDUM OPINION & ORDER**

09 Civ. 1285 (PGG)

MACANDREWS & FORBES LLC,

                             Plaintiff,

      -against-

DONALD G. DRAPKIN,

                             Defendant.

**MEMORANDUM OPINION & ORDER**

09 Civ. 4513 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        These are breach of contract actions.  Donald Drapkin alleges that Mafco

Consolidated Group, Inc. breached a separation agreement by failing to pay him $2.5 million,

while MacAndrews & Forbes LLC – successor to MacAndrews & Forbes, Inc., and parent of

Mafco Consolidated Group, Inc. (together, the "Company") – claims that Drapkin violated the

separation agreement by breaching provisions concerning return of Company files and

documents, reimbursement of medical expenses, non-disparagement, and attempts to induce or

influence employees to leave the Company.

        Drapkin has moved for summary judgment in both actions, which are mirror

images of each other.  In 09 Civ. 1285, his motion seeks an order granting him summary

judgment on his breach of contract claim and dismissing a counterclaim asserted against him for

breach of contract.  (09 Civ. 1285, Dkt. No. 58 (Notice of Motion)).  In 09 Civ. 4513, Drapkin

seeks summary judgment on the Company's breach of contract claim against him and on the

breach of contract counterclaim he filed in that action.  (09 Civ. 4513, Dkt. No. 62 (Notice of

Motion)).  For the reasons stated below, Drapkin's motions for summary judgment will be

granted in part and denied in part.

## BACKGROUND

Drapkin joined the Company in 1987 as vice chairman and served in that capacity

until 2007.  (Drapkin R. 56.1 Stmt. ¶¶ 10, 31)[1]  He worked closely with Ronald O. Perelman, the

Company's chief executive officer and Board chairman.  (Id. ¶¶ 6, 15)  Drapkin's relationship

with Perelman became strained over time, and in 2007 Drapkin left the Company to become vice

chairman of Lazard International.  (Id. ¶¶ 17, 31)  Drapkin asked his assistant of twenty years,

Nancy Link, to join him at Lazard.  (Id. ¶¶ 16, 32)

### A.    Separation Agreement and Stock Purchase Agreement

Before Drapkin's departure, he and the Company agreed to a separation package

that required the Company to pay Drapkin a total of approximately $27.5 million over five years.

(Company R. 56.1 Stmt. ¶ 171; Keane Decl., Ex. 24 (Separation Agreement) Section 3(a); Keane

Decl., Ex. 34 (Stock Purchase Agreement) ¶ 3)  The terms of the separation package are set forth

in a Separation Agreement and Stock Purchase Agreement, both dated April 25, 2007.  (Drapkin

R. 56.1 Stmt. ¶¶ 21-22, 24, 31)  The Separation Agreement provides that MacAndrews & Forbes

LLC will pay Drapkin approximately $15.5 million in seven installments:

---

[1]  Unless otherwise noted, citations to the parties' Rule 56.1 statements concern factual assertions
that are admitted or are deemed admitted because they were neither admitted nor denied by the
opposing party or have not been contradicted by citations to admissible evidence.  See Giannullo
v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . .  fails to
controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed
admitted.") (citations omitted).

> The Company will pay to you an aggregate amount of $15,500,000 less such deductions or amounts to be withheld as required by applicable law and regulations, payable as follows: $2,250,000 on July 1, 2009; $2,250,000 on January 1, 2010, $2,250,000 on July 1, 2010; $2,250,000 on January 1, 2011; $2,250,000 on July 1, 2011; $2,250,000 on January 1, 2012; and $2,000.000 on July 1, 2012.

(Keane Decl., Ex. 24 (Separation Agreement) Section 3(a))

The Stock Purchase Agreement provides that Mafco Consolidated Group, Inc. will buy back 200,000 shares of M&F Worldwide Corp. from Drapkin, paying him $5 million upon delivery of these shares and an additional $7 million in three installments: $2.25 million on January 1, 2008; $2.25 million on July 1, 2008; and $2.5 million on January 1, 2009. (Keane Decl., Ex. 34 (Stock Purchase Agreement) Section 3(a)-(b))

Drapkin also has a right to reimbursement of medical expenses under the Separation Agreement:

> Until you reach the age of 65, the Company will reimburse you for any medical expenses (defined as those expenses covered by the executive medical reimbursement program then in effect for the Company, from time to time) incurred by you and your immediate family which are not otherwise reimbursed through medical plans, if any, covering you or your immediate family.

(Keane Decl., Ex. 24 (Separation Agreement) Section 3(b))

Drapkin has a number of obligations under the Separation Agreement, including (1) to return, under certain circumstances, Company-related documents and files, whether in hard copy or electronically stored; (2) not to disparage the Company or its management; and (3) not to induce or attempt to induce any Company employee – other than Link – to leave the Company.

With respect to return of Company files, the Separation Agreement provides in pertinent part:

You . . . agree to deliver promptly to the Company at any time the Company may so request all memoranda, notes, records, reports, manuals, drawings, blueprints and other documents (and all copies thereof), including data stored in computer memories or on other media used for electronic storage and retrieval, relating to the Company's business or the business of its affiliates and all property associated therewith, which you may possess or have under your control.

(Id. at Section 6(a))

[Y]ou may continue to possess the equipment identified in Section I of Annex C, which equipment shall become your property on December 31, 2007, provided that you promptly provide to the Company copies of all electronic files in your (or your personal assistant's) personal possession relating to the Company or its affiliates and not otherwise available to the Company, after which you delete (and do not attempt to recover) all copies of such files in your possession.

(Id. at Section 6(h)[2]

With respect to non-disparagement, the Separation Agreement states:

You agree not to take any action or to make any statement that does, or is reasonably likely to, enter the public domain and disparages the business or management of the Company or any of the Company's affiliates, or any of its Related Persons, with respect to any period during which you were either employed by the Company or receive benefits under this Agreement.  The Company agrees that it shall not instruct or authorize any directors, officers, agents, or employees of the Company or any of the Company's affiliates or any of its Related Persons to take any action or make any statement, written or oral, that disparages or criticizes you.  Nothing in this Section 5 shall prevent you or the Company, the Company's affiliates or any of its Related Persons from truthfully responding in connection with governmental inquiries or as required by subpoena, court order or legal process.  Upon receipt by either party of written notice of any breach of this Section 5, the party receiving such notice shall have a period of 10 days to respond to and cure any such breach.

(Id. at Section 5)

With respect to inducing employees to leave the Company, the

Separation Agreement states:

---

[2]  Section I of Annex C to the Separation Agreement lists a variety of electronic equipment, including cell phones, computers, and a Blackberry.  (Keane Decl., Ex. 24 (Separation Agreement), Annex C)

> For a period of two years from the date hereof, you shall not, directly or indirectly, (i) induce or attempt to influence any employee of the Company or its affiliates (other than Nancy Link [Drapkin's assistant]) to terminate his or her employment with the Company. . . .

(Id. at Section 6(c))

The Separation Agreement further provides that "any material breach" of those terms would enable the Company to rescind the agreements, reclaim the benefits provided to Drapkin thereunder, and stop performing.  (Id. at Section 9)  As to waiver, the Separation Agreement states:

> The failure of either party at any time or times to require performance of any provision hereof will in no manner affect the right at a later time to enforce the same.  No waiver by either party of the breach of any term or covenant contained in this agreement, whether by conduct or otherwise, in any one or more instances, will be deemed to be, or construed as, a further or continuing waiver of any such breach, or a waiver of the breach of any other term or covenant contained in this agreement.

(Id. at Section 11)

### B.    Drapkin's Departure From The Company

In late April 2007, Steven Fasman, an in-house lawyer at the Company (August 2, 2010 Fasman Decl., ¶ 1), met with Drapkin, explained that he "was following up on the agreement and [] wanted to know if [Drapkin] had anything he wanted to turn over."  (Company Resp. to Drapkin R. 56.1 Stmt. ¶ 77)  Drapkin told Fasman that he did not.[3]  (Drapkin R. 56.1 Stmt. ¶ 78)  The parties agree that Fasman never made any other request to Drapkin for the return of documents, and that "Fasman never made any written request to Drapkin for any documents or recorded in writing any oral request."  (Drapkin R. 56.1 Stmt. ¶ 80)

---

[3]  Drapkin denies that this conversation ever occurred.  (Drapkin Resp. to Company Rule 56.1 Stmt. ¶ 221; Company R. 56.1 Stmt. ¶ 224)

On April 30, 2007, Drapkin told Link, his assistant, that they would be moving to Lazard and instructed her to "get rid of any documents we do not need." (Company R. 56.1 Stmt. ¶¶ 226, 227) Drapkin testified that he did not have "anything crisp and clear in [his] mind when [he] said it," but that he "certainly wanted [Link] to save [his] personal emails" and "get rid of things that related to MacAndrews & Forbes that [he] didn't need or want or care about." (Company R. 56.1 Stmt. ¶ 229) Link testified that she went through documents on her laptop computer and deleted "[a]nything that wasn't personal" and also deleted "a few" word processing files, but "was doing it very quickly because [she] was leaving quickly." (Company R. 56.1 Stmt. ¶¶ 230, 231) Although the parties disagree as to the number of Company-related documents that were not deleted from Link's laptop computer, they agree that – after this litigation was commenced – 849 e-mails and 79 other Company-related documents were found on Link's laptop. (Drapkin R. 56.1 Counter-Stmt. ¶ 244)

Drapkin joined Lazard on May 1, 2007. (Drapkin R. 56.1 Stmt. ¶ 31) While Lazard offers health insurance to its employees, Drapkin did not enroll in the Lazard health insurance plan between May 1, 2007 and December 31, 2008. (Drapkin R. 56.1 Stmt. ¶¶ 53, 54) The parties disagree as to whether Drapkin, under the Separation Agreement, was required to obtain health insurance from Lazard. Drapkin asserts that he "was not obligated to acquire health insurance coverage from Lazard," and that "[w]ithin days of [his] departure from [the Company, Company] personnel wrongly removed [him] and his family from health insurance coverage . . . effective as of May 1, 2007." (Drapkin R. 56.1 Stmt. ¶¶ 49, 52) The Company disagrees, stating that "Drapkin began employment following his M&F employment with an employer that had available a primary care plan, and he was therefore no longer entitled to coverage under the Company's Basic Plan." (Company Resp. to Drapkin R. 56.1 Stmt. ¶ 49)

The Company further alleges that Drapkin breached the Separation Agreement by "seeking and receiving reimbursement for medical expenses [from the Company]" since his departure.  (Keane Decl., Ex. 3 (Company Cmplt.) at ¶ 15)

On May 14, 2007, Drapkin had dinner with Dr. Eric Rose, a friend who worked at the Company.  (Drapkin R. 56.1 Stmt. ¶¶ 148, 150)  Drapkin had helped recruit Rose – formerly at Columbia-Presbyterian Hospital – to the Company to assist in expanding the Company's life sciences mergers and acquisitions business.  (Company R. 56.1 Stmt. ¶¶ 177, 180, 184)  At dinner, Drapkin allegedly made remarks "denigrating [Ronald Perelman] as a person."  (Drapkin R. 56.1. Stmt. ¶ 151; Cogan Decl., Ex. 62 (Rose Dep.) at 96-97)  Drapkin also told Rose that "he thought that Ronald [Perelman] and MacAndrews were not interested in life sciences. . . . [a]nd that as a career opportunity for [Rose] this was going to be disastrous."  (Drapkin R. 56.1 Stmt. ¶ 153; Cogan Decl., Ex. 62 (Rose Dep.) at 97-98)  While Drapkin's remarks about the Company's lack of interest in the life sciences "frightened" Rose, and caused him to raise his "personal antennae  . . . with regard to that issue" (Drapkin R. 56.1 Stmt. ¶ 155; Cogan Decl., Ex. 62 (Rose Dep.) at 101), he remained at the Company and indeed reported Drapkin's remarks to Company executives soon after the dinner.  (Drapkin R. 56.1 Stmt. ¶¶ 158, 161)

The Company made two $2.25 million payments to Drapkin on January 1 and July 1, 2008.  (Drapkin R. 56.1 Stmt. ¶ 35)  The Company did not, however, make the $2.5 million payment scheduled for January 1, 2009, claiming that Drapkin had breached the Separation Agreement.  (Drapkin R. 56.1 Stmt. ¶¶ 35-37)  Drapkin then filed suit, contending that the Company had breached the Separation Agreement by failing to make the January 1, 2009 payment.  (Cogan Decl., Ex. 46 (Drapkin Cmplt.))  The Company then sued Drapkin, claiming that he had breached the Separation Agreement by failing to return Company documents and

files and improperly seeking reimbursement for medical expenses.  (Keane Decl., Ex. 3 (Company Cmplt.))

## DISCUSSION

Summary judgment is appropriate where "there is no genuine dispute as to any material fact" and a party "is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  "'[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.'"  Longview Equity Fund, L.P. v. iWorld Projects & Sys., Inc., No. 05 Civ. 6745(RJS), 2008 WL 833230, at *2 (S.D.N.Y. Mar. 26, 2008) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

A court deciding a summary judgment motion must "'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . .[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'"  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

In a breach of contract action, "[i]n order for [a party] to prevail on its summary judgment motion, it must be clear at the outset that there are no genuine issues of material fact

that either [the party] did not breach an agreement, or if it did, that its breach does not rise to the appropriate level of materiality to justify termination of the agreement." Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc., 361 F. Supp. 2d 283, 291 (S.D.N.Y. 2005) (citing Correspondent Servs. Corp. v. J.V.W. Invs. Ltd., 173 F. Supp. 171, 178 (S.D.N.Y. 2001)). "Under New York law, 'an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.'" Id. at 290 (quoting First Invs. Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998)). "A fundamental principle of contract law provides that the material breach of a contract by one party discharges the contractual obligations of the non-breaching party." Id. at 291 (citing In re Lavigne, 114 F.3d 379, 387 (2d Cir. 1997); Medinol Ltd. v. Boston Scientific Corp., 346 F. Supp. 2d 575, 618 (S.D.N.Y. 2004); Restatement (Second) of Contracts § 237 (1981)).

Where a breach of contract is alleged, "there may be circumstances in which the question of materiality is a question of law for the judge." Id. at 295 (citing Frank Felix Assocs., Ltd. v. Austin Drugs, Inc., 111 F.3d 284, 284 (2d Cir. 1997); Jafari v. Wally Findlay Galleries, 741 F. Supp. 64 (S.D.N.Y. 1990); McDonald's Corp. v. Robert A. Makin, Inc., 653 F. Supp. 401 (W.D.N.Y. 1986)). "However, in most cases, the question of materiality of breach is a mixed question of fact and law – usually more of the former and less of the latter – and thus is not properly disposed of by summary judgment." Bear, Stearns Funding, Inc, 361 F. Supp. 2d at 295-96; see also Teachers Ins. and Annuity Ass'n of Am. v. Coaxial Commc'ns of Cent. Ohio, Inc., 807 F. Supp. 1155, 1160 (S.D.N.Y. 1992) ("It is for the jury to determine materiality with respect to any alleged breach."); F. Garofalo Elec. Co., Inc. v. New York University, 300 A.D.2d 186, 189 (1st Dept. 2002) ("The question of whether there has been substantial performance – or a breach – is to be determined, whenever there is any doubt, by the trier of fact.").

"'[A] written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed.'"  Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J., 08-CV-7069 (KMK), 08-CV-11107 (KMK), 2009 WL 1154094, at *5 (S.D.N.Y. Mar. 19, 2009) (quoting Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000)).  "Typically, the best evidence of intent is the contract itself; if an agreement is 'complete, clear and unambiguous on its face[, it] must be enforced according to the plain meaning of its terms.'"  Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (quoting Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002)).  Accordingly, where a "'contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.'"  RJE Corp. v. Northville Indus. Corp., 329 F.3d 310, 314 (2d Cir. 2003) (quoting De Luca v. De Luca, 300 A.D.2d 342, 342 (2d Dept. 2002)).

"If the contract is ambiguous, extrinsic evidence may be considered 'to ascertain the correct and intended meaning of a term' or terms."  Eternity Global Master Fund Ltd., 375 F.3d at 177-78 (quoting Greenfield, 98 N.Y.2d at 569).  As the Second Circuit has said:

> "[A]mbiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 184 (2d Cir. 2003) (internal quotation marks omitted). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts."  W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990).

Eternity Global Master Fund Ltd., 375 F.3d at 178.

"Where there are alternative, reasonable constructions of a contract, i.e., the contract is ambiguous, the issue 'should be submitted to the trier of fact.'"  K. Bell & Assocs., 97

F.3d 632, 637 (quoting Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir.

1993)); see also Haber v. St. Paul Guardian Ins. Co., 137 F.3d 691, 695 (2d Cir. 1998)

("Language in a . . . contract will be deemed ambiguous if reasonable minds could differ as to its

meaning."); State v. Home Indem. Co., 66 N.Y.2d 669, 671 (1985) (per curiam) ("If . . . the

language in the . . . contract is ambiguous and susceptible of two reasonable interpretations, the

parties may submit extrinsic evidence as an aid in construction, and the resolution of the

ambiguity is for the trier of fact.").  However, "[l]anguage whose meaning is otherwise plain

does not become ambiguous merely because the parties urge different interpretations in the

litigation."  Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989).

"Thus, the court should not find the contract ambiguous where the interpretation urged by one

party would 'strain [] the contract language beyond its reasonable and ordinary meaning.'"  Law

Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 467 (quoting

Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456, 459 (1957)).

I.      **DRAPKIN IS ENTITLED TO SUMMARY JUDGMENT
        ON THE COMPANY'S CLAIM THAT HE BREACHED
        THE SEPARATION AGREEMENT BY SEEKING
        REIMBURSEMENT OF HIS MEDICAL EXPENSES**

              The Company's Complaint alleges that Drapkin breached the Separation

Agreement by "seeking and receiving reimbursement for medical expenses [from the Company]"

when health insurance was available to him at Lazard.  (Keane Decl., Ex. 3 (Company Cmplt.) at

¶¶ 15-19; see also Company Opp. Br. 37)  According to the Company, "[a]t the very least, the

language of Section 3(b) [of the Separation Agreement] is ambiguous as to whether Drapkin had

an obligation to obtain coverage from Lazard," and that it was the parties' intent and "clear

understanding that Drapkin would obtain basic healthcare coverage from his new employer."

(Company Opp. Br. 37)

Drapkin moves for summary judgment on this claim, arguing that "[t]he Separation Agreement unambiguously provides that Drapkin is entitled to reimbursement for medical expenses so long as he has not sought or obtained reimbursement under another plan." (Drapkin Br. 11)  Drapkin further contends that "[n]othing in the plain language requires Drapkin to seek reimbursement through any other health insurance plan potentially available to him before seeking reimbursement from the Company."  (Id.)

With respect to reimbursement of medical expenses, the Separation Agreement provides:

> Until you reach the age of 65, the Company will reimburse you for any medical expenses (defined as those expenses covered by the executive medical reimbursement program then in effect for the Company, from time to time) incurred by you and your immediate family which are not otherwise reimbursed through medical plans, if any, covering you or your immediate family.

(Keane Decl., Ex. 24 (Separation Agreement) Section 3(b))

Nothing in this provision requires Drapkin to obtain health insurance from a new employer.  "[Where] an agreement is 'complete, clear and unambiguous on its face[, it] must be enforced according to the plain meaning of its terms.'"  Eternity Global Master Fund Ltd., 375 F.3d at 177 (quoting Greenfield, 98 N.Y.2d at 569).

While the Company contends that "Barry Schwartz, who negotiated the provision on behalf of the Company, testified that the parties shared the clear understanding that Drapkin would obtain basic healthcare coverage from his new employer" (Company Br. 37), that alleged understanding is not reflected in Section 3(b).  Where a "'contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.'"  RJE Corp., 329 F.3d at 314 (quoting De Luca, 300 A.D.2d 342).  Here, the plain language of the Separation Agreement does not require Drapkin to seek health insurance from his future employer.

Because there is no evidence that Drapkin was reimbursed by Lazard for medical expenses that he submitted to the Company for reimbursement, there is no credible argument that he acted improperly in seeking reimbursement from the Company. Drapkin is entitled to summary judgment on the Company's claim that he breached Section 3(b) of the Separation Agreement.[4]

## II.  DRAPKIN IS ENTITLED TO SUMMARY JUDGMENT ON THE COMPANY'S NON-DISPARAGEMENT CLAIM

The Company contends (Company Br. 23) that Drapkin breached the non-disparagement clause in Section 5 of the Separation Agreement, which provides:

> You agree not to take any action or to make any statement that does, or is reasonably likely to, enter the public domain and disparages the business or management of the Company or any of the Company's affiliates, or any of its Related Persons, with respect to any period during which you were either employed by the Company or receive benefits under this Agreement. . . . Upon receipt by either party of written notice of any breach of this Section 5, the party receiving such notice shall have a period of 10 days to respond to and cure any such breach.

(Keane Decl., Ex. 24 (Separation Agreement) Section 5)

The Company has offered evidence that Drapkin, at a dinner with Dr. Eric Rose, made comments "denigrating Ron [Perelman] as a person" and "denigrating MacAndrews as a

---

[4]  Because the Company's breach argument is refuted by the plain language of the Separation Agreement, the Court does not reach Drapkin's arguments regarding estoppel.

To the extent that the Complaint contends that a claim concerning Drapkin's adult daughter constitutes proof of breach, the Company does not address this issue in its opposition brief. Accordingly, the claim has been abandoned. See, e.g., Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (citing Douglas v. Victor Capital Grp, 21 F.Supp.2d 379, 393 (S.D.N.Y.1998) (collecting cases)). In any event, it is undisputed that Drapkin had no knowledge of his adult daughter's alleged claim and that the claim was not paid. (Drapkin R. 56.1. Stmt. ¶¶ 73-74)  Accordingly, even if such a claim was submitted and could be viewed as a breach of the Separation Agreement, any breach would be immaterial.

workplace." (Cogan Decl., Ex. 62 (Rose Dep.) at 96-98)  In moving for summary judgment, Drapkin does not dispute that he disparaged Perelman and the Company, but instead argues that (1) the Company failed to give notice and an opportunity to cure, as required by Section 5 of the Separation Agreement; and (2) the Company has not offered proof that Drapkin's remarks to Dr. Rose did, or were "reasonably likely to, enter the public domain." (Drapkin Br. 26-28; Drapkin Reply Br. 11-13)

        The Company argues that its admitted failure to give notice and an opportunity to cure is excused, because "'adherence to the cure provision of a contract is not required where it would be a futile act.'"  (Def. Br. 24) (citing Sea Tow Servs. Intern., Inc. v. Pontin, 607 F. Supp. 2d 378, 389 (E.D.N.Y. 2009).  The Company contends that once Drapkin disparaged the Company and Perelman, he committed an incurable breach.  (Id. at 25)

        As an initial matter, adopting the Company's interpretation would render the notice and opportunity to cure provision meaningless.  "New York law clearly 'disfavors interpretations that render contract provisions meaningless or superfluous.'"  Palm Bay Int'l, Inc. v. Marchesi Di Barolo S.P.A., No. CV 09-599(ADS)(AKT), 2011 WL 2690473, at *16 (E.D.N.Y. July 11, 2011) (quoting Manley v. AmBase Corp., 337 F.3d 237, 250 (2d Cir. 2003)); see also USI Ins. Servs. LLC v. Miner, No. 10 Civ. 8162(LAP), 2011 WL 2848139, at *5 (S.D.N.Y. July 7, 2011) (quoting LaSalle Bank N.A. v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005)); Legal Aid Soc'y v. City of New York, 114 F. Supp. 2d 204, 229 (S.D.N.Y. 2000) ("[B]asic principles of contract interpretation militate against the adoption of an interpretation that would render any portion of the contract language a nullity.").

        Moreover, "[t]he [futility] exception to the general rule favoring enforcement of notice and cure provisions is a narrow one."  Point Prod. A.G. v. Sony Music Entm't, Inc., No.

93 Civ. 4001, 2000 WL 1006236, at *4 (S.D.N.Y. July 20, 2000).  Futility is found "only in

limited circumstances," which include "where the non-performing party (1) expressly repudiated

the parties' contract or (2) abandons performance thereunder."  Id.  (internal quotation and

citation omitted).   Here, the Company makes no such allegations.

        Finally, none of the cases cited by the Company (Company Br. 24-25) involves a

non-disparagement clause or supports the Company's argument that a notice and opportunity to

cure provision may be ignored in this context.

        Because the Company did not give Drapkin notice and an opportunity to cure as

required under Section 5, it may not contend that he breached this provision.  Accordingly,

Drapkin is entitled to summary judgment on this claim.

        Even if the notice and opportunity to cure provision could be disregarded, the

Company has not offered evidence creating a material issue of fact as to whether Drapkin's

remarks to Dr. Rose entered the public domain, or were made under circumstances in which it

was "reasonably likely [that they would] enter the public domain."  (Keane Decl., Ex. 24

(Separation Agreement) Section 5)

        It is undisputed that at the time Drapkin spoke with Dr. Rose, Dr. Rose was a

friend and current employee of the Company.  In interpreting the term "public domain" in the

Separation Agreement, the Court is required to give the """words . . . the meanings ordinarily

ascribed to them.""" Mastrovincenzo v. City of New York, 435 F.3d 78, 104 (2d Cir. 2006)

(quoting  World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co., 345 F.3d 154, 184 (2d

Cir.2003) (quoting Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 135 (2d Cir.1986)).

The term "public domain" typically refers to dissemination to the general public.  See, e.g.,

Weaver v. Chrysler Corp., 172 F.R.D. 96, 101 (S.D.N.Y. 1997) (fraudulent statements were in

the "public domain" because they had been disseminated to the general public); United States ex rel. Doe v. John Doe Corp., 960 F.2d 318, 323 (2d Cir. 1992) (information in the "public domain" where it had been disseminated to the general public); Smith v. Daily Mail Publ'g Co., 443 U.S. 97, 103 (1979) (information that is "publicly revealed" is in the "public domain").

The Company has offered no reasonable interpretation of "public domain" that would include disclosure to a friend and current employee of the Company.  Nor has the Company articulated a theory under which Drapkin's remarks to a friend and current employee of the Company were "reasonably likely [] to enter the public domain."  The Company has not argued, for example, that Dr. Rose had any motive to share Drapkin's remarks with the general public, nor is there any evidence that he did so.[5]  In sum, even if the notice and cure provision could be read out of the contract, Drapkin would still be entitled to summary judgment on the Company's non-disparagement claim, because the Company has offered no evidence that Drapkin's remarks to Dr. Rose entered the public domain or were reasonably likely to do so.

## III.   DRAPKIN'S MOTION FOR SUMMARY JUDGMENT CONCERNING THE COMPANY'S DOCUMENT RETENTION CLAIMS WILL BE GRANTED IN PART AND DENIED IN PART

The Company alleges that Drapkin improperly retained Company-related documents and files and thereby breached Sections 6(a) and 6(h) of the Separation Agreement. (Keane Decl., Ex. 3 (Company Cmplt. ¶¶ 12, 13, 23-27)  The documents and files at issue were stored on the laptop computer of Drapkin's assistant, Nancy Link.  (Id. at ¶¶ 13-14)

### A.   Breach Claim Concerning Section 6(a) of the Separation Agreement

In Section 6(a) of the Agreement, Drapkin agreed

to deliver promptly to the Company at any time the Company may
so request all memoranda, notes, records, reports, manuals,

---

[5]  Indeed, Dr. Rose took the opposite tack:  instead of disclosing Drapkin's remarks to the general public, he reported them to Company management.  (Drapkin R. 56.1. Stmt. ¶ 158)

> drawings, blueprints and other documents (and all copies thereof),
> including data stored in computer memories or on other media
> used for electronic storage and retrieval, relating to the Company's
> business or the business of its affiliates and all property associated
> therewith, which you may possess or have under your control.

(Keane Decl., Ex. 24 (Separation Agreement) Section 6(a) (emphasis added))

As is clear from the language of Section 6(a), it is not self-executing. The Company has the right to demand that Drapkin turn over all Company-related documents or files, whether in hard copy or electronically stored, but absent such a demand, Drapkin has no obligation to do so under Section 6(a).

Drapkin moves for summary judgment, arguing that the Company has not offered evidence demonstrating that it asked Drapkin to turn over all Company-related documents and files in his custody or control. In opposing Drapkin's motion, the Company relies on the following testimony from its in-house lawyer, Steven Fasman, concerning a conversation he had with Drapkin during his last week of employment at the Company:

> Q.      . . . how many conversations do you recall having with Mr. Drapkin in the week before he left?
>
> A.      A few.
>
> Q.      A few?
>
> A.      Yes.
>
> Q.      Meaning three to five?
>
> A.      Meaning between two and five.
>
> Q.      And do you have a specific recollection of any such conversations or do you just generally recall you ran into him three or four times?
>
> A.      Only one.
>
> Q.      So there was a single conversation that is distinct in your memory?

A.      Yes.

Q.      Where did that take place?

A.      Mr. Drapkin's office.

Q.      When did it take place?

A.      Sometime between April 25th and April 30th.

Q.      How do you know that?

A.      Because it was after this [i.e., the Separation Agreement] was signed, to the best of my recollection, and before he left.

Q.      Who else was present, if anyone?

A.      Just he and I.

Q.      Did you initiate that conversation or he?

A.      I did.

Q.      You went to his office or called him or asked him to come to his office to talk with him?

A.      I believe I appeared in his office.

Q.      To the best of your recollection, describe that conversation to me.

A.      I told him that I was following up on the agreement and I wanted to know if he had anything he wanted to turn over. He said that he did not.  He had taken care of whatever needed to be done and that was it.

Q.      How long did this discussion last?

A.      Just a few minutes.

Q.      And what you just described is the sum and substance of it?

A.      Yes.

Q       Did you make any reference to anything specific in terms of anything he needed to turn over?

A.      No.

Q.      You just said do you have anything you need to turn over?

A.      Yes.

Q.      And he said he had taken care of it?

A.      He said no, there wasn't and he had taken care of everything that needed to be done.

Q.      So he had said he had nothing that needed to be turned over?

A.      Correct.

(Cogan Decl., Ex. 53 (Fasman Dep.) at 123-25) (emphasis added); see also Company Br. 11 (citing Company R. 56.1 Stmt. ¶ 221))  Drapkin denies that any such conversation with Fasman took place.  (Drapkin Resp. to Company Rule 56.1 Stmt. ¶ 221; Company R. 56.1 Stmt. ¶ 224)

    Fasman's testimony is not sufficient to create a material issue of fact as to whether the Company ever demanded, pursuant to Section 6(a) of the Separation Agreement, that Drapkin turn over all Company-related documents and files in his custody or control. Fasman did not demand that Drapkin turn over all such materials; instead, according to Fasman's testimony, he asked Drapkin whether "he had anything he wanted to turn over" or anything he "needed to turn over."  (Cogan Decl., Ex. 53 (Fasman Dep.) at 124).  This language cannot be reasonably interpreted as constituting a demand that Drapkin produce documents, and the Company has produced no evidence that Drapkin understood Fasman's vague inquiry in that manner.

Because the Company has not produced evidence showing that it demanded that Drapkin produce documents and files as required by Section 6(a) of the Separation Agreement, Drapkin is entitled to summary judgment on this claim.

**B.      Breach Claim Concerning Section 6(h) of the Separation Agreement**

Drapkin also moves for summary judgment on the Company's claim that he violated Section 6(h) of the Separation Agreement.  That provision states:

> [Y]ou may continue to possess the equipment identified in Section I of Annex C, which equipment shall become your property on December 31, 2007, provided that you promptly provide to the Company copies of all electronic files in your (or your personal assistant's) personal possession relating to the Company or its affiliates and not otherwise available to the Company, after which you delete (and do not attempt to recover) all copies of such files in your possession.

(Keane Decl., Ex. 24 (Separation Agreement) Section 6(h))

Section 6(h), in contrast to Section 6(a), is self-executing, in the sense that if Drapkin decides to keep Company-provided electronic equipment, he must give the Company copies of all Company-related electronic files on his or his assistant's computers – to the extent that such files are "not otherwise available to the Company – and to then delete all Company-related electronic files in his possession.  It is undisputed that hundreds of Company-related emails and other documents were found on Link's laptop after this litigation ensued.  (Drapkin R. 56.1 Counter-Stmt. ¶ 244)

Drapkin argues that "Section 6(h) clearly requires return only of documents that were otherwise unavailable to the Company at the time of Drapkin's departure," and the Company cannot show that the documents were not "otherwise available."  (Drapkin Br. 16) Drapkin further argues that to the extent he or his assistant may have unwittingly retained any documents, such "inadvertent retention of these documents (among the thousands of files on the laptop) is not a material breach that could be found to excuse the Company's performance."

(Drapkin Br. 22)  The Company argues that "Section 6(h) affirmatively obligated Drapkin to delete (and not attempt to recover) all electronic files relating to the Company or its affiliates in his or in Link's possession, ***whether or not any are otherwise available to the Company***." (Company Br. 33 (emphasis in original))

Drapkin is not entitled to summary judgment on this claim.  The obvious purpose of the disputed language in Section 6(h) is to require Drapkin to (1) give the Company copies of Company-related electronic files "not otherwise available" to the Company; and (2) delete and "not attempt to recover" electronically-stored, Company-related documents and files.  To the extent that Drapkin argues that he was only required to delete documents "not otherwise available to the Company" (Drapkin Reply Br. 8), that interpretation is not consistent with the apparent purpose of Section 6(h) and, in any event, is not an interpretation that this Court can adopt as a matter of law.

Drapkin's argument that any breach of Section 6(h) is not material likewise cannot be resolved, at this stage of the litigation, as a matter of law.  As noted above, "in most cases, the question of materiality of breach is a mixed question of fact and law – usually more of the former and less of the latter – and thus is not properly disposed of by summary judgment." Bear, Stearns Funding, Inc, 361 F. Supp. 2d at 295; see also Teachers Ins. and Annuity Ass'n of Am., 807 F. Supp. at 1160 ("It is for the jury to determine materiality with respect to any alleged breach.")  On the record presently before it, this Court cannot rule as a matter of law that any breach by Drapkin of Section 6(h) is not material.

Accordingly, Drapkin is not entitled to summary judgment on the Company's claim that he violated Section 6(h) of the Separation Agreement by failing to delete electronically-stored Company-related documents and files.

**IV.      DRAPKIN IS NOT ENTITLED TO SUMMARY**
**<u>JUDGMENT ON THE COMPANY'S SECTION 6(C) CLAIM</u>**

        Drapkin has moved for summary judgment on the Company's claim that he

breached Section 6(c) of the Separation Agreement, which states:

> For a period of two years from the date hereof, you shall not,
> directly or indirectly, (i) induce or attempt to influence any
> employee of the Company or its affiliates (other than Nancy Link
> [Drapkin's assistant]) to terminate his or her employment with the
> Company . . . .

(Keane Decl., Ex. 24 (Separation Agreement) Section 6(c))

        In opposing Drapkin's motion, the Company cites the following testimony from

Dr. Rose concerning his dinner conversation with Drapkin on May 14, 2007:

> Q.      What did [Drapkin] say specifically in substance or sum that denigrated
> MacAndrews as a workplace?
>
> A.       He told me specifically that he thought that Ronald [Perelman] and
> MacAndrews were not interested in life sciences.  And that as a career
> opportunity for me that this was going to be disastrous.
>
> Q.      Did he use the word disastrous or was that your conclusion from what he
> said? . . . . Or you don't recall?
>
> A.      I don't recall his exact words.
>    . . . .
>
> Q.      And was that the reason that he advised you that he thought as a long term
> proposition that employment at MacAndrews was not a good idea for you
> because he thought Ronald Perelman and MacAndrews were not
> interested in life sciences?
>    . . . .
>
> A.      I would say that was a key part of his advice to me.

(Keane Decl., Ex. 20 (Rose Dep.) at 97-98)

        Drapkin argues that he is entitled to summary judgment on the Company's

Section 6(c) claim because (1) this claim was not pled until after briefing on dispositive motions

had begun; (2) the Company is estopped from claiming a violation of Section 6(c) because it continued making payments to Drapkin even after learning about his remarks to Dr. Rose; and (3) Drapkin's comments do not, as a matter of law, constitute an "attempt to influence" Rose to leave the Company.  (Drapkin Reply Br. 16)  None of these arguments has merit.

Drapkin has been on notice since October 8, 2009, that the Company contended that his remarks to Dr. Rose at the May 14, 2007 dinner breached his obligations under Section 6(c) of the Separation Agreement.  At a deposition on that day, the Company's in-house lawyer, Steven Fasman, explicitly testified that the Company contended that Drapkin's remarks to Rose at the May 14, 2007 dinner constituted a breach of Sections 5 (non-disparagement) and 6(c) of the Separation Agreement.  ((Cogan Decl., Ex. 53 (Fasman Dep.) at 387)  Moreover, the Company cited Drapkin's alleged breach of Section 6(c) in its "Answer and Affirmative Defenses to Third Amended Complaint" (09 Civ. 4513, Dkt. No. 55)  Finally, Drapkin had ample opportunity to brief the issue, having not filed his reply brief in his action until August 31, 2010.  For all these reasons, the Company may pursue its claim that Drapkin breached Section 6(c) of the Separation Agreement.

Drapkin's estoppel argument is likewise misplaced.  "The doctrine of equitable estoppel can be raised 'where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct.'" Garrett v. Music Publ'g Co. of Am., LLC, 740 F. Supp. 2d 457, 463 (S.D.N.Y. 2010) (quoting Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 725 (2d Cir. 2001)).  "Under New York law, '[t]he elements of estoppel are with respect to the party estopped:  (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts.  The party

asserting estoppel must show with respect to himself:  (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in his position."' Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 607 (2d Cir. 2005) (quoting Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp., 76 A.D.2d 68, 81-82 (4th Dept 1980)). Here, Drapkin's estoppel argument fails because, inter alia, he has not alleged reliance on the Company's conduct.  See Aetna Cas. & Sur. Co., 404 F.3d at 607.

To the extent that Drapkin presents a waiver argument, that argument is barred by the Section 11 of the Separation Agreement, which provides:

> The failure of either party at any time or times to require performance of any provision hereof will in no manner affect the right at a later time to enforce the same.  No waiver by either party of the breach of any term or covenant contained in this agreement, whether by conduct or otherwise, in any one or more instances, will be deemed to be, or construed as, a further or continuing waiver of any such breach, or a waiver of the breach of any other term or covenant contained in this agreement.

(Keane Decl., Ex. 24 (Separation Agreement) Section 11)

Finally, it is a jury question whether Drapkin's remarks to Dr. Rose were an attempt to influence him to leave the Company.  The fact that Rose stayed at the Company is not dispositive of this claim, because Section 6(c) forbids an "attempt to influence," whether successful or not.  (Id. at Section 6(c))

Accordingly, Drapkin is not entitled to summary judgment on the Company's claim that he breached Section 6(c) of the Separation Agreement.

## CONCLUSION

For the reasons stated above, Drapkin's motions for summary judgment in 09 Civ. 1285 and 09 Civ. 4513 are granted in part and denied in part.  Drapkin's motion in 09 Civ. 1285 is granted to the extent that Mafco's counterclaim is based on alleged violations of Sections 3(b),

5, and 6(a) of the Separation Agreement. The motion is otherwise denied. Drapkin's motion in

09 Civ. 4513 is granted to the extent that MacAndrews &Forbes LLC's breach claim relates to

Sections 3(b), 5, and 6(a) of the Separation Agreement. Drapkin's motion in 09 Civ. 4513 is

otherwise denied.

The Clerk of the Court is directed to terminate the following motions: 09 Civ.

1285, Dkt No. 58, and 09 Civ. 4513, Dkt. No. 62.

The parties are directed to consult and comply with this Court's Individual Rules

concerning the preparation of a joint pretrial order.

Dated: New York, New York
September 23, 2011

SO ORDERED.

Paul G. Gardephe
United States District Judge

25